# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

## IFG PORT HOLDINGS LLC,

*Plaintiff - Appellant*,

v.

## LAKE CHARLES HARBOR & TERMINAL DISTRICT,
## doing business as PORT OF LAKE CHARLES,

*Defendant - Appellee.*

On Appeal from the United States District Court
for the Western District of Louisiana (Lake Charles)
No. 2:16-CV-146 (Hon. Michael Joseph Truncale)

## APPELLANT'S OPENING BRIEF

Samir Deger-Sen
Peter Trombly
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-4619
samir.deger-sen@lw.com
peter.trombly@lw.com
kristin.holladay@lw.com

Gregory G. Garre
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Thomas M. Flanagan
FLANAGAN PARTNERS, LLP
201 St. Charles Ave., Suite 3300
New Orleans, LA 70170
(504) 569-0235
tflanagan@flanaganpartners.com

*Counsel for Plaintiff-Appellant IFG Port Holdings LLC*

June 26, 2025

# CERTIFICATE OF INTERESTED PERSONS

***IFG Port Holdings LLC v. Lake Charles Harbor & Terminal District,***

***Doing Business As Port Of Lake Charles*, No. 24-30552**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.  **Plaintiff-Appellant:**

    IFG Port Holdings LLC

2.  **Defendant-Appellee:**

    Lake Charles Harbor & Terminal District, doing business as Port of Lake Charles

3.  **Counsel for Plaintiff-Appellant:**

    Gregory G. Garre, LATHAM & WATKINS LLP, 555 Eleventh Street, NW, Suite 1000, Washington, DC 20004

    Samir Deger-Sen, LATHAM & WATKINS LLP, 1271 Avenue of the Americas, New York, NY 10020

    Peter Trombly, LATHAM & WATKINS LLP, 1271 Avenue of the Americas, New York, NY 10020

    Kristin C. Holladay, LATHAM & WATKINS LLP, 1271 Avenue of the Americas, New York, NY 10020

    Thomas M. Flanagan, FLANAGAN PARTNERS LLP, 201 St. Charles Ave., Suite 3300, New Orleans, LA 70170

Kay A. Theunissen, MAHTOOK & LAFLEUR, L.L.C., 600 Jefferson Street, Suite 1000, Lafayette, LA 70501

K. Eric LaFleur, LAFLEUR & LABORDE (NO), 612 Andrew Higgins Dr., Suite 3001, New Orleans, LA 70130

James Kee Irvin, LAFLEUR & LABORDE (NO), 612 Andrew Higgins Dr., Suite 1001, New Orleans, LA 70130

Stephanie B Laborde, LAFLEUR & LABORDE, 6160 Perkins Rd., Suite 225, Baton Rouge, LA 70808

**4.** **Counsel for Defendant-Appellee:**

Michael H. Rubin, MCGLINCHEY STAFFORD, P.L.L.C., 301 Main Street, Suite 1400, Baton Rouge, LA 70801

Douglas Jay Cochran, STONE PIGMAN, WALTHER & WITTMANN, 301 Main Street, Suite 1150, Baton Rouge, LA 70825

Nicholas John Wehlen, STONE PIGMAN, WALTHER & WITTMANN, 909 Poydras Street, Suite 3150, New Orleans, LA 70112

Michael Wendell McKay, LONG LAW FIRM, L.L.P., 1800 City Farm Drive, Building 6, Baton Rouge, LA 70806

Dated: June 26, 2025

*/s/ Gregory G. Garre*
Gregory G. Garre

*Counsel of record for Plaintiff-Appellant IFG Port Holdings LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully submits that oral argument would be beneficial to this Court's consideration of the novel and important issues regarding the "extraordinary circumstances" required under 28 U.S.C. § 636(c)(4) to revoke consent to the referral of a case to a magistrate judge and the standard of knowledge that applies when a losing party seeks to vacate a referral on the ground that it lacked knowledge of counsel's asserted relationship with the magistrate judge.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF AUTHORITIES ................................................................................ vi

INTRODUCTION ................................................................................................ 1

JURISDICTIONAL STATEMENT ..................................................................... 6

STATEMENT OF THE ISSUES.......................................................................... 6

STATEMENT OF THE CASE............................................................................. 7

      A.     The Port Breaches Its Agreement With IFG And Engages In An Unlawful Campaign To Extort IFG ..................................................... 7

      B.     After Years Of Litigation, IFG Prevails At Trial ................................. 9

      C.     The Port Moves To Vacate The Referral ........................................... 11

      D.     This Court Remands For Further Proceedings.................................... 12

      E.     The District Court Grants The Port's Motion To Vacate.................... 14

      F.     The District Court Adheres To Its Ruling In The Face Of Newly Discovered Evidence Concerning Judge Kay's Facebook Account................................................................................................ 21

SUMMARY OF ARGUMENT ......................................................................... 27

STANDARD OF REVIEW ............................................................................... 30

ARGUMENT .................................................................................................... 31

I.     THE DISTRICT COURT ERRED AS A MATTER OF LAW BY ADOPTING A HEIGHTENED ACTUAL-KNOWLEDGE STANDARD.................................................................................................. 31

      A.     The Knowledge Standard Under 28 U.S.C. § 636(c)(4) Must Account For Statute, Precedent, And Analogous Contexts ............... 31

B.      The District Court's Heightened Actual-Knowledge Standard Is Fundamentally Incompatible With These Principles ..........................37

C.      The District Court's Heightened Standard Would Invite Gamesmanship And Create A Disclosure Nightmare For Judges ......41

II.     UNDER ANY PROPER KNOWLEDGE STANDARD, THE PORT HAD SUFFICIENT KNOWLEDGE ABOUT THE RELATIONSHIP BETWEEN JUDGE KAY, MONK, AND THEIR FAMILIES LONG BEFORE JUDGE KAY RULED AGAINST THE PORT ...........................42

A.      The Record Contains Ample Evidence Establishing The Port's Knowledge Of The Relationship Between Judge Kay And Monk.....................................................................................................43

B.      This Evidence Meets Any Reasonable Knowledge Standard Under 28 U.S.C. § 636(c)(4) .............................................................51

C.      There Was No "Deep" Or "Intimate" Friendship Between Judge Kay, Monk, And Their Families To Begin With ................................54

III.    REGARDLESS OF THIS APPEAL'S OUTCOME, THIS COURT SHOULD PROVIDE GUIDANCE FOR FURTHER PROCEEDINGS ......57

CONCLUSION ..........................................................................................................60

# TABLE OF AUTHORITIES

**Page**

## CASES

*Af-Cap Inc. v. Republic of Congo*,
383 F.3d 361 (5th Cir. 2004) ...............................................................30

*Ashker v. Newsom*,
968 F.3d 975 (9th Cir. 2020) ...............................................................59

*Baynes v. Cleland*,
799 F.3d 600 (6th Cir. 2015) ...............................................................38

*BLOM Bank SAL v. Honickman*,
605 U.S. ___, 145 S. Ct. 1612 (2025)..................................................33

*Carter v. Land Sea Services, Inc.*,
816 F.2d 1018 (5th Cir. 1987) .......................................................20, 31

*Colonial Stores, Inc. v. FTC*,
450 F.2d 733 (5th Cir. 1971) ...............................................................31

*Delesdernier v. Porterie*,
666 F.2d 116 (5th Cir. 1982) ...............................................................37

*GO Computer, Inc. v. Microsoft Corp.*,
508 F.3d 170 (4th Cir. 2007) ...............................................................54

*Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*,
803 F.3d 144 (3d Cir. 2015) ................................................................41

*Harvest Church v. Resound Church*,
No. 22-cv-2285, 2024 WL 5168125 (D. Colo. Dec. 19, 2024).............54

*Health Services Acquisition Corp. v. Liljeberg*,
796 F.2d 796 (5th Cir. 1986), *aff'd*, 486 U.S. 847 (1988)...................37

*Herbst v. Scott*,
42 F.3d 902 (5th Cir. 1995) ..................................................................32

*IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal District*,
82 F.4th 402 (5th Cir. 2023) .........................................................*passim*

*Intel Corp. Investment Policy Committee v. Sulyma*,
589 U.S. 178 (2020) ..................................................................2, 31, 32, 38, 39

*Kerns v. First State Bank of Ben Wheeler (In re Kerns)*,
130 F.4th 455 (5th Cir. 2025) ...............................................................35

*Light-Age, Inc. v. Ashcroft-Smith*,
922 F.3d 320 (5th Cir. 2019) ................................................................36

*Liljeberg v. Health Services Acquisition Corp.*,
486 U.S. 847 (1988)..................................................................................33

*Monster Energy Co. v. City Beverages, LLC*,
940 F.3d 1130 (9th Cir. 2019) .............................................................40

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)..................................................................................43

*Norris v. Schotten*,
146 F.3d 314 (6th Cir. 1998) .........................................................34, 35

*Shaffer v. Priority One Bank*,
No. 15-cv-304, 2021 WL 2386824 (S.D. Miss. June 10, 2021), *aff'd*,
No. 21-60802, 2023 WL 2706907 (5th Cir. Mar. 29, 2023) ...........36

*Sheehan v. Whitley*,
110 F.3d 794, 1997 WL 119894 (5th Cir. Mar. 11, 1997) ...............36

*Spectrum Association Management of Texas, L.L.C. v. Lifetime HOA Management L.L.C.*,
5 F.4th 560 (5th Cir. 2021) ...................................................................30

*United States v. Apfelbaum*,
445 U.S. 115 (1980)..................................................................................53

*United States v. Dobey*,
751 F.2d 1140 (10th Cir. 1985) ...........................................................34

*United States v. Morin*,
627 F.3d 985 (5th Cir. 2010) ...............................................................38

*United States v. Restrepo-Granda*,
  575 F.2d 524 (5th Cir. 1978) ...........................................................32

*United States v. Santos*,
  553 U.S. 507 (2008)..........................................................................32

*United States v. Whorley*,
  550 F.3d 326 (4th Cir. 2008) ...........................................................35

*United States v. Wilson*,
  116 F.3d 1066 (5th Cir. 1997), *vacated in part on other grounds sub
  nom.*, *United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) ............36

*Vantage Health Plan, Inc. v. Willis-Knighton Medical Center*,
  913 F.3d 443 (5th Cir. 2019) ..............................................................6

*Woods v. Ampco System Transporation, Inc.*,
  No. 05-cv-2040, 2005 WL 8172100 (D. Colo. Dec. 5, 2005)...........55

## STATUTES

28 U.S.C. § 636(c)(4).................................................6, 27, 31, 33, 54

28 U.S.C. § 1291 ....................................................................................6

## OTHER AUTHORITIES

*Black's Law Dictionary* (12th ed. 2024)...........................................31, 32

Fed. R. Civ. P. 60(b) ...........................................................................33

Fed. R. Civ. P. 73(b)(3)........................................................................33

12 *Moore's Federal Practice* (3d ed. 2024) ........................................33

## INTRODUCTION

This appeal concerns the legal standard for knowledge that governs vacatur of a referral to a magistrate judge under 28 U.S.C. § 636(c)(4). In a prior appeal, this Court held that a party's lack of knowledge of a "deep and longstanding" or "intimate" relationship may require vacatur of a party's consent to a magistrate-judge referral and remanded for an evidentiary inquiry to determine whether the movant, defendant Lake Charles Harbor & Terminal District ("Port"), knew of any such relationship between Magistrate Judge Kathleen Kay and William Monk, plaintiff IFG Port Holdings LLC's ("IFG") counsel. On remand, the record confirmed that the Port's thirteenth-hour, strategic gambit to overturn the result of a twenty-day trial failed. While their lives intersected at times in the small community of Lake Charles and Monk was friends decades ago with Judge Kay's now-deceased husband, there was no "longstanding," "deep," or "intimate" relationship between Judge Kay and Monk. Both Judge Kay and Monk—who would know best—denied any such relationship. And the Port's counsel knew—or, at a minimum, should have known—that Judge Kay and Monk knew one another outside of the fact that Monk's daughter was clerking for Judge Kay. The Port's own general counsel was active Facebook friends with Judge Kay and even "liked" a post about Judge Kay's 1989 wedding on which the Port's motion to vacate was predicated.

Yet, applying a novel "actual knowledge" standard of its own creation, the district court nonetheless vacated the judgment for lack of consent under section 636(c)(4). That standard is legally flawed three times over. *First*, the district court demanded "direct evidence" of actual knowledge, disregarding the essential role of circumstantial evidence in proving knowledge. ROA.29114-15. Courts have long recognized that a "'usual way[]' to prove actual knowledge" is an "'inference from circumstantial evidence,'" *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020) (citations omitted), because parties typically do not admit knowledge that will be detrimental to their case. Demanding "direct evidence" of knowledge of years- or decades-old events imposes a functionally impossible burden. Indeed, as the district court's own application of this standard confirms, under such a rule a disappointed party's own self-serving and implausible denials of knowledge or recollection of events pave the way for vacatur.

*Second*, the district court held that "only actual," not "constructive," "knowledge of a relationship suffices for knowing and voluntary consent to a magistrate judge." ROA.28897. Under the district court's standard, a party's lack of diligence in ascertaining available facts before consenting to a referral is irrelevant. But excusing a lack of diligence is incompatible with the fact that Congress limited the vacatur of referrals under section 636(c)(4) to "extraordinary circumstances." And, in closely analogous contexts—such as motions for recusal,

to disqualify jurors, or to remove arbitrators—courts apply a constructive-knowledge standard in considering whether to vacate an otherwise valid judgment. Ignoring a lack of diligence in this context also invites sandbagging by parties who blind themselves to facts to create the possibility of vacatur if they lose at trial.

And, *third*, the district court's ramped-up, actual-knowledge standard compounds these errors by requiring knowledge of the "true nature" and "full extent" of the relationship—a hopelessly vague and practically insurmountable standard, especially on top of these other requirements. Even if a party has knowledge about several connections between a magistrate judge and opposing counsel, it will always be able to seek vacatur by arguing it was not aware of the "*full* extent" or "*true* nature" of these connections, or that some other undisclosed connection would have impacted its consent. And, once again, this standard is fundamentally incompatible with section 636(c)(4)'s "extraordinary circumstances" requirement. Indeed, since its knowledge standard is virtually unmeetable, the district court's rule would make vacatur the *norm*—not an extraordinary event.

Under any reasonable standard for evaluating knowledge, the Port's motion to vacate fails. In its untested affidavit, the Port claimed it had *no idea* that Judge Kay's relationship with Monk extended beyond the fact that his daughter was clerking for Judge Kay. But the district court's *own* findings show that the Port had extensive knowledge of the relationship between Judge Kay and Monk. Most

significantly, smoking-gun evidence established that the Port's then-general counsel—who approved the Port's consent in this case—knew of Judge Kay's relationship with Monk because he was active Facebook friends with Judge Kay and even "liked" a post containing the Facebook photos of Monk at Judge Kay's 1989 wedding—the same photos that the Port relied on in seeking vacatur. Short of an admission, it is difficult to imagine clearer evidence of knowledge—yet, the district court deemed it insufficiently "direct" to rebut the Port's proffer of ignorance.

That proffered ignorance is all the more implausible because the Port's outside counsel practiced in the same small community and interacted with Judge Kay and Monk at the same social events for decades. And they were present at status conferences in this case where Judge Kay and Monk referred to their children—who attended school together—in familiar terms, a red flag that Judge Kay and Monk knew each other outside of court. None of this was a secret in this small community in which counsel and their spouses frequently interacted, and it certainly was not hidden. Indeed, two of the Port's counsel's wives "discovered" the relationship to which the Port was supposedly blind after only a brief search of the same Facebook account that the Port's General Counsel himself regularly engaged with. It was only through imposition of an impossible-to-rebut actual-knowledge standard that the district court could ignore this extensive evidence of knowledge.

What's more, the record establishes that there was no "deep" or "intimate" relationship between Judge Kay and Monk to begin with. Indeed, Judge Kay testified that she did not even consider Monk to be a friend. Or, as Polly Norman, the wife of the Port's own trial counsel, said, there was "no close friendship." They were successful professionals in a relatively small community who had kids who were the same age and Monk was friends with Judge Kay's husband, so of course their social and professional lives intersected at times. That was true for nearly all the lawyers working on the case—on *both* sides—and their spouses. But the notion that Judge Kay and Monk were somehow "deep" or "intimate" friends is refuted by the record. The district court's contrary conclusion places magistrate judges in the impossible position of having to disclose virtually all of their social connections even when they earnestly believe that they are not "deep" or "intimate"—lest they hand a disgruntled litigant a trump card to challenge a referral after losing on the merits.

In its prior opinion, this Court stressed that the Port's *allegations* that Judge Kay and Monk somehow hid from the tight legal community in Lake Charles a "deep" and "intimate" friendship had not been tested. Now they have been—and they fail, miserably. The district court's decision granting the Port's motion to vacate should be reversed, and the judgment against the Port reinstated.

# JURISDICTIONAL STATEMENT

On July 26, 2024, the district court granted the Port's motion to vacate the referral of this case to a magistrate judge. ROA.28905. On August 23, 2024, IFG appealed that order, ROA.28972-74, and moved for reconsideration and to alter or amend the judgment pursuant to Rule 59(e), ROA.28911-13. On February 6, 2025, the district court entered an order denying IFG's motion. ROA.29089-117. IFG amended its notice of appeal to include the district court's order denying the motion for reconsideration and to alter or amend the judgment. ROA.29118-20. Under 28 U.S.C. § 1291 and the collateral-order doctrine, this Court has jurisdiction to resolve appeals from these orders because they "(1) conclusively determine [a] disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) [are] effectively unreviewable on appeal from a final judgment." *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 448 (5th Cir. 2019). As IFG explained in its opposition to the Port's motion to dismiss filed on February 28, 2025, this appeal readily satisfies those criteria.

# STATEMENT OF THE ISSUES

A party seeking to vacate a magistrate-judge referral must establish "extraordinary circumstances." 28 U.S.C. § 636(c)(4). The issues are:

1.      Whether the district court correctly held that vacatur of a magistrate-judge referral based on a lack of knowing consent is required unless there is "direct"

evidence of the movant's "actual knowledge" of the "full extent and nature" of an alleged relationship between the judge and opposing counsel.

2.    Whether, under any proper knowledge standard, the Port established the "extraordinary circumstances" required for such a vacatur here.

## STATEMENT OF THE CASE

### A.    The Port Breaches Its Agreement With IFG And Engages In An Unlawful Campaign To Extort IFG

Lake Charles, Louisiana, is a small city that is home to a port that connects Contraband Bayou to a federal ship channel.  *IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal Dist.* (*IFG*), 82 F.4th 402, 405-06 (5th Cir. 2023).  The Port rents lots to commercial tenants, including IFG, which sought to construct an export grain terminal at Berth 8 of the Port.  *Id.*

In a January 2008 letter of intent regarding the terminal, the "Port agree[d] to take reasonable steps to work with [U.S. Army Corps of Engineers ("USACE")] to deepen and thereafter maintain the depth alongside and approaching Berth 8."  ROA.34345.  The Port also stated that it would "provide IFG with information relating to ... engineering studies."  ROA.34345.

In a 2011 lease, IFG agreed to construct a grain-export facility, and the Port agreed to obtain permits for dredging a waterway to make IFG's facility accessible to large vessels.  ROA.21706-16.  IFG finished construction of the facility in July

2015, but the Port failed to make the waterway ready for dredging until April 2019, depriving IFG of years of business. ROA.21723, 21749, 21756-59.

In the interim, the Port attempted to extort IFG into renegotiating its lease to incorporate new terms more favorable to the Port. ROA.21720-21. The Port had neither studied slope-stability issues nor obtained a permit from the USACE authorizing the necessary dredging. ROA.21720-21; *IFG*, 82 F.4th at 406. Indeed, internally, the Port was uncertain that Berth 8 would "structurally accommodate" the dredging. ROA.34531; *see* ROA.21722-23. Yet the Port hid that concern from IFG and, instead, asserted that *IFG* was in default on the lease, issued "bogus" default notices, and threatened eviction unless IFG made unwarranted payments and concessions. ROA.21757-63.

Meanwhile, the Port told IFG that it had "determined that there are *no* geotechnical restrictions related to the wharf and dock facilities adjacent to the area to be dredge[d]." ROA.21727 (emphasis added) (quoting default notice). That assertion was not only "false," but also "dangerous." ROA.21728. And, in late 2015, the Port doubled down by refusing to withdraw the default notice until IFG resolved seven issues—six of which were unrelated to dredging. ROA.21730-31. This was "nothing less than extortion." ROA.21732.

**B.  After Years Of Litigation, IFG Prevails At Trial**

On January 29, 2016, IFG—left with no other reasonable option—turned to the courts for relief.  It sued the Port, alleging breach of the Lease and violations of the Louisiana Unfair Trade Practices Act (LUTPA) in the U.S. District Court for the Western District of Louisiana.  ROA.118-50.

The case was assigned to District Judge Patricia Minaldi and Magistrate Judge Kathleen Kay.  ROA.28850.  IFG's lead counsel was William Monk, a well-known member of the local bar who had represented IFG in various matters since 2012.  ROA.28850, 33444, 45182.  The Port was represented by Joe Mize and his son, Matthew Mize.  ROA.28850 & n.8.  By February 11, 2016, Joe Mize knew that Monk's daughter, Margaret, was clerking for Judge Kay, ROA.45172-73; ROA.28851 n.11, and Judge Kay informed both parties of that fact and her plan to screen Margaret from the case, ROA.28851.  Neither party objected.  ROA.28851.

On April 20, 2016, Joe Mize asked the Port's then-general counsel, Michael Dees, "to decide whether we will consent to a trial by the magistrate."  ROA.28851.  Dees, who had known both Judge Kay and Monk for years in the relatively small legal community of Lake Charles and was an active Facebook friend of Judge Kay's (*infra* at 21, 26-27), replied "[w]e prefer magistrate."  ROA.28852; ROA.33936 (Dees became Port's general counsel in January 1995).  On April 21, 2016, the Port told IFG that the Port had "no objection to Magistrate [Judge] Kay trying this case."

ROA.45178.  IFG later consented on January 27, 2017, and the case was referred to Judge Kay for trial.  ROA.28847, 28852.

On March 8, 2019, shortly before trial, Dees expanded the Port's legal team by hiring Merrick (Rick) Norman, who had chaired the panel that recommended Judge Kay's appointment and reappointment.  ROA28853-54, 45150-51, 45157-58. When Dees spoke to him about joining the case, Norman explained:  "[Y]ou know [Judge Kay] and I know her.  I'm friendly enough with her and practice[d] law with her in the same firm for [a] while and I was on the committee that had her appointed, twice.  I'm not saying she'd do me any favors but she'll listen for sure."  ROA.45227. Norman also knew Monk.  ROA.33763-65.

From March 18, 2019, to April 30, 2019, a twenty-day trial was held.  *IFG*, 82 F.4th at 406.  It went poorly for the Port.  After trial, Norman remarked that "all signs point to disaster."  ROA.28858; ROA.33860-61; ROA.45241.  Then he told his co-counsel that "[i]f Kathy screws us, we may want to take the gloves off and ask for a new trial."  ROA.28858 (footnotes omitted); ROA.45245.  The Port did not pursue such a motion.  ROA.33733-34; ROA.28858-59.

On July 31, 2020, Judge Kay issued a 64-page opinion (Post-Trial Order) finding the Port liable for breach of contract and violating the Louisiana Unfair Trade Practices Act.  ROA.21702-65.  The order held that the Port was liable for damages, attorneys' fees, and lost profits, but instructed the parties to compute damages based

on the Port's calculations for the loss associated with each vessel IFG was prevented from processing. ROA.21756-59. Because the Port's "actions were deliberate" and were intended "to run IFG off the Port property," the order further held that the requirements of LUTPA's treble damages provision were met. ROA.21761-65.

## C. The Port Moves To Vacate The Referral

While not unexpected, the Post-Trial Order was a "devastating" blow to the Port. ROA.28861 n.45. Matt Mize called it the "worst case scenario." ROA.28861; ROA.45259. Norman wondered whether there was a way to "[t]ake the case away from [Judge Kay] before she awards damages," by filing a "motion to recuse based on Margaret Monk." ROA.45268; ROA.45282. Norman suggested this even though Monk had emailed Norman about Margaret's clerkship with Judge Kay five years before the Post-Trial Order, ROA.45159—and even though Norman's own son had done an externship for Judge Kay, ROA.28883.

The Port's attorneys discussed the decision with their spouses. On or around August 2, 2020, two days after the Post-Trial Order issued, Maura Mize (Joe's wife) searched Judge Kay's Facebook page and readily came across publicly posted photos of Monk at Judge Kay's 1989 wedding. ROA.28864-65. Maura Mize shared these photos with Joe Mize. ROA.28865; ROA.45277. Leslie Mize (Matt's wife) found additional photos of Monk dressed as a groomsman for Judge Kay's husband at the wedding and of Judge Kay officiating the wedding of Monk's other daughter,

Lucie Monk, in 2015. ROA.28866-67. Norman told Matt Mize "I don't see grounds for recusal" based on the photos and noted that his wife, Polly Norman, "says there is no close friendship" between Judge Kay and Monk. ROA.28865; ROA.45273.

In mid-August 2020, the Port retained new counsel from another city, ROA.22907, 33749, who devised a new strategy. A month later, the Port moved to vacate the referral to Judge Kay. ROA.22909-16. In support of the motion, Matt Mize averred in a three-page affidavit that Monk had served as a groomsman in Judge Kay's wedding thirty years earlier and that Judge Kay had officiated the wedding of Lucie Monk five years earlier. ROA.22918-20. The Port asserted that if these "events, and the complete nature of the relationship between the Monks and Magistrate Judge Kay been disclosed," the Port would not have consented to the referral of this matter to Judge Kay. ROA.22920.

Chief Judge Terry Doughty denied the Port's motion to vacate. ROA.23145-56. The court noted that "some prior social and/or professional interactions" are common in "relatively small legal communities, such as Lake Charles." ROA.23153. The fact that the Port is "now unhappy" with Judge Kay's decision "is not a basis to vacate the reference." ROA.23154-56.

### D. This Court Remands For Further Proceedings

On appeal, this Court remanded for further proceedings on the Port's motion to vacate the referral. *IFG*, 82 F.4th at 412, 421. The Court held that the Port's

allegations regarding an "undisclosed longstanding friendship," "if true," raised "serious doubts" about the validity of the Port's consent to Judge Kay. *Id.* at 405. But this Court recognized that the Port's assertions "remain[ed] untested." *Id.* at 421; *see id.* at 417 (emphasizing that, "critically," Mize's assertion that the Port's "counsel did not learn about this friendship until after Magistrate Judge Kay's order and reasons … has not been subject to evidentiary testing and cross-examination").

This Court directed the district court to determine the following on remand:

(1) The extent of Judge Kay's friendship with Monk and his family;

(2) What Judge Kay disclosed to the parties about any such relationship and when;

(3) The nature of the Port's "investigation"; and

(4) When the Port first knew that Judge Kay's relationship to Monk extended beyond Monk's daughter, her law clerk.

*See id.* at 421.

The Court also explained that "if the Port learned of the intimacy of the friendship" between Monk and Judge Kay "*before* entry of judgment and chose to remain silent, then its consent would remain valid." *Id.* at 417. "If the Port knew about the friendship all along, or even if it discovered it shortly before Magistrate Judge Kay issued her order, the 'delay' factor would likely doom its claim now." *Id.* at 419. And "[i]f … the facts alleged about this friendship (as deep and longstanding) are untrue, or if the friendship is otherwise distant … then the nondisclosure may not render the Port's consent unknowing." *Id.* at 417.

**E.    The District Court Grants The Port's Motion To Vacate**

By en banc order, all judges of the Western District of Louisiana were recused from the remand proceeding, and the case was transferred to Judge Michael Truncale of the Eastern District of Texas.  ROA.26385.  Following an evidentiary hearing, the district court vacated the referral.  ROA.28847-905.

*Knowledge Standard.*  The district court held that "only actual knowledge of a relationship suffices for knowing and voluntary consent to a magistrate judge." ROA.28897.  In the court's view, the application of a constructive-knowledge standard in analogous contexts was "factually and contextually distinct." ROA.28897-99.  The court further reasoned that this Court's opinion required an actual-knowledge standard because it "tasked" the district court to determine what "the Port 'knew.'"  ROA.28899 (citation omitted).

*Extent and Nature of Relationship.*  The district court found the following facts regarding the nature of Judge Kay's relationship with Monk:

- In the 1980s and early 1990s, Judge Kay and her husband (Scott McPherson) and Monk and his wife (Aimee Monk) were "part of a bigger group of young couples in Lake Charles who would get together, play Trivial Pursuit, and go out to dinner."  ROA.28874-75.  These group "get togethers" tapered off "as children entered the picture."  ROA.28875.

- McPherson—who was friends with Monk and sometimes golfed with him in the 1980s, ROA.28875; ROA.33454-55; ROA.33429-30—asked Monk to be an usher in his 1989 wedding to Judge Kay, and when a groomsman "dropped out," Monk stepped in as a replacement, ROA.28875.

- Judge Kay's and Monk's sons "hung out quite a bit" until "the end of elementary school or beginning of middle school." ROA.28876 & n.77. In 2009, Judge Kay and Aimee Monk drove a carpool with their children and friends to a summer camp. ROA.28876. Judge Kay's son joined the Monk family on one vacation in 2010. ROA.28876.

- In 2015, Judge Kay was asked to officiate Lucie Monk's wedding while Margaret Monk was clerking for Judge Kay. ROA.28878 n.79; ROA.33289. Joe Mize and Maura Mize were invited to Lucie Monk's October 2015 wedding, as were Norman and his wife (Polly Norman). ROA.33456-58; ROA.45374. Polly Norman co-hosted a pre-wedding event and attended the wedding. ROA.33455-56. "[F]rom the very beginning," Polly Norman knew that Judge Kay "would be the officiant." ROA.34041-42.

- After the wedding, Polly Norman and Maura Mize "liked" a photo on Facebook showing Judge Kay as the officiant. ROA.28889.



ROA.45162-64.

Aimee Monk also tagged Judge Kay by name in a post.



ROA.45166.

And Maura Mize expressed her regret that she and Joe Mize could not attend.



ROA.45374.

- On September 30, 2017, Monk and his wife attended the wedding of Judge Kay's daughter, Sally. ROA.28879; ROA.33458. Rick and Polly Norman not only attended, too, but walked into the wedding ceremony with the Monks. ROA.28879; ROA.33458.

- Judge Kay and her husband had dinner with Bill and Aimee Monk (and often other people) seven times. ROA.28877-78.

- Monk attended a 2014 party to celebrate Judge Kay's wedding anniversary, ROA.28878, and in 2018, Monk and other Lake Charles attorneys attended a surprise birthday party for Judge Kay, ROA.28879; ROA.33436.

The district court also made other findings about the limits of the connections between Judge Kay, Monk, and their families:

- Judge Kay testified that although Monk was her husband's friend—and it was "not comfortable for" her to say—she "never really considered Mr. Monk to be a friend of mine." ROA.33279; *see* ROA.28879. Monk testified that his friendship with Judge Kay was "old" and not "'intimate.'" ROA.33452.

- After Judge Minaldi's retirement in July 2017, Monk told Judge Kay about his hope of becoming a federal judge and asked her about the application process. ROA.28876-77 & n.78. Judge Kay "gossip[ed]" about those ambitions with Norman; Judge Kay knew that Norman felt "negative[ly]" about Monk, and Judge Kay herself did not want Monk to be her Article III judge. ROA.33345-46; ROA.28876-77 & n.78.

*Disclosures.* The district court acknowledged that Judge Kay and Monk discussed "their children" during status conferences, ROA.28890, and asked about each other's children by name with the Port's counsel present, ROA.33425-27. But the court described this as "non-descript banter," and found that, other than Judge Kay's disclosure that Margaret was her law clerk, "no disclosures were made about the friendship between Judge Kay, Monk, and their families." ROA.28890.

*Investigation.* The district court found that the Port's investigation after Maura and Leslie Mize "discovered" the Facebook photos consisted of Rick Norman "questioning" his wife about the relationship, the Port's new attorneys questioning Matt Mize, Norman, Jonathan Ringo (the Port's new general counsel), and the Port

Board about the relationship, and the Port's new attorneys' "efforts to locate someone capable of providing an affidavit regarding the Judge Kay-Monk relationship." ROA.28890-91. Ultimately, the Port's motion relied on publicly available Facebook posts. ROA.28873.

*Knowledge of the Relationship.* According to the district court, "[t]he Port first learned that Judge Kay's relationship to Monk extended beyond her employment of Margaret as her law clerk on August 2, 2020." ROA.28891.

The district court noted that the Port's general counsel, Dees, followed Judge Kay's Facebook page, which annually featured photos of Judge Kay's wedding that included Monk. But based on Dees's equivocal testimony that he "did not think" he was Facebook friends with Judge Kay (but was not sure) and "he had never seen any photos of Judge Kay's wedding," the court concluded that Dees never learned of any relationship between Monk and Judge Kay. ROA.28887-88; *see* ROA.28888 ("[T]here is no evidence that Dees saw Facebook photos of Judge Kay's wedding or Lucie's wedding, or that he was otherwise aware of the friendship ...."

As to Norman, the district court recognized that he "socializ[ed] with Judge Kay and Monk." ROA.28886, 28877 & n.78. But the court found that there was no direct evidence that Norman knew about the supposed "closeness between Judge Kay, Monk, and Monk's family before August 2020." ROA.28886.

Finally, the district court found no direct evidence that either Joe or Matt Mize "knew that Judge Kay's relationship to Monk extended beyond her employment of Margaret as her law clerk until after Judge Kay's ruling." ROA.28890.

Carter *Factors.* The district court applied the factors enumerated in *Carter v. Land Sea Services, Inc.*, 816 F.2d 1018, 1021 (5th Cir. 1987), to evaluate the Port's motion to vacate the referral. *IFG*, 82 F.4th at 414-15.

Applying its own "actual knowledge" standard, the district court concluded that the Port's consent was unknowing. ROA.28900-01. The court principally relied on the fact that the Port's witnesses "unequivocally denied any knowledge of this friendship before the ruling came out" and that the Port's counsel did not "mention this friendship" in written communications before the ruling came out. ROA.28900. Although ample evidence showed that the Port's counsel knew about many connections between Judge Kay, Monk, and their families that extended beyond Monk's daughter's employment as a law clerk to Judge Kay, including the 1989, 2015, and 2017 weddings, the district court held that the Port lacked the requisite knowledge because it did not actually know the "true nature" or "full extent" of the Judge Kay-Monk relationship. ROA.28881 n.84; ROA.28886 n.94.

The district court's knowledge ruling also shaped its rulings on the remaining *Carter* factors, which it found favored vacatur. ROA.28901-02.

**F.      The District Court Adheres To Its Ruling In The Face Of Newly Discovered Evidence Concerning Judge Kay's Facebook Account**

On August 2, 2024—after the district court denied IFG's motion for discovery regarding Judge Kay's Facebook page, ROA.28837-44, and after several failed attempts by Judge Kay to reactivate her Facebook account, which was suspended in September 2020, ROA.28872-73, 33320-21—Judge Kay's account was reactivated by Facebook's legal department.  ROA.29097-98.

The account showed that Dees—the Port's then-general counsel—actually "liked" a July 1, 2014 post shared by Judge Kay containing multiple photos of her 1989 wedding—the very event on which the Port relied to argue that its consent to the referral must be vacated.  ROA.29105; ROA.28940.



Monk himself is one of the thirteen people tagged as being "with" Judge Kay in her July 1, 2014 post, and at least four of the photos in the post show Monk as a member of the 1989 wedding party.









ROA.29106-10 (red emphasis added by district court); *see* ROA.28941-43.

Judge Kay reposted photos from her 1989 wedding on her wedding anniversary each year. ROA.28875. On July 1, 2016, she updated her "cover photo"

to an image of the wedding party and separately posted a photo of her husband with his groomsmen. ROA.29108-09. Both photos included Monk.





Then, on June 28, 2017, Judge Kay updated her profile picture on her Facebook account to a photo from her 1989 wedding that included Monk.



ROA.29109-10.

In addition to showing that Dees "liked" the post that included photos showing Monk in Judge Kay's wedding, the newly available Facebook data showed that Dees regularly "liked" and commented on Judge Kay's photos, including profile pictures, cover photos, and other posts. ROA.29110-11.

At the evidentiary hearing, Dees had equivocated about whether he was Facebook friends with Judge Kay and denied that he was a frequent Facebook user. ROA.28887-88. But the new evidence refuted that testimony. It showed that Dees liked, commented on, or discussed *over ten* of Judge Kay's profile pictures, photos, and posts *after* the litigation commenced and the parties consented to Judge Kay.



All 👍 66 ❤ 7  ✕

Michael K. Dees

ROA.28955; *see also* ROA.28940-62 (Dees commenting on photos or liking Judge Kay's photos posted on September 3, 2016, June 23, 2017, October 17, 2017, November 2, 2017, November 15, 2017, November 25, 2017, and December 1, 2018); ROA.28858; ROA.45209; ROA.29109-111.

The district court recognized that this evidence was new and that IFG diligently presented it because the Facebook evidence was unavailable prior to the evidentiary hearing. ROA.29100. And the district court found that "Dees interacted with Judge Kay's Facebook profile relatively close in time to when she changed her profile picture to an image with Mr. Monk in it." ROA.29113.

Applying its "actual knowledge standard to the new evidence," the district court nevertheless held that Dees lacked the requisite knowledge. ROA.29113-14

& n.26.  Although the court acknowledged that "Dees 'liked' the" post of Judge Kay's 1989 wedding photos, it said that "Monk was not depicted in any of the five thumbnail photos" on the first page of the post.  ROA.29115.  The court further stressed that there was no "direct evidence" that Dees saw the photo of Monk in the wedding party at Judge Kay's 1989 wedding (the "cover photo" on Judge Kay's Facebook profile every year on her wedding anniversary), ROA.29108, 29115, or saw the photos that Judge Kay posted of Monk as a groomsman.  ROA.29115.  The court thus held that Dees lacked actual knowledge.  ROA.29112; ROA.29115.

## SUMMARY OF ARGUMENT

The district court erred in holding that the Port has established the "extraordinary circumstances" necessary to vacate a party's consent to a magistrate-judge referral based on the Port's claim that it had no idea that Judge Kay's relationship with Monk extended beyond Monk's daughter's clerkship for Judge Kay, at any time before August 2020.  28 U.S.C. § 636(c)(4).

**I.**     The district court's decision rests on a heightened, actual-knowledge standard that is flawed for several reasons as a matter of law.

The knowledge standard applicable to motions to vacate a magistrate-judge referral under 28 U.S.C. § 636(c)(4) must align with the statutory text forbidding vacatur except under "extraordinary circumstances," precedent applying that standard, the knowledge standard used in analogous contexts, and the need to deter

sandbagging by parties seeking to undo adverse decisions long after they consented to a magistrate judge. Those considerations require a knowledge standard that permits circumstantial evidence of a party's knowledge, and accounts for what a party *should* have known if it had exercised reasonable diligence. The district court, however, went in the opposite direction and erected a novel knowledge standard that a movant can evade simply by *denying* actual knowledge of a relationship—even when there is overwhelming evidence that they knew.

The district court's standard requires (1) direct evidence of (2) actual knowledge of the (3) full extent of an alleged relationship. Each of those requirements is flawed. *First*, the court erred in requiring direct evidence of actual knowledge. Circumstantial evidence is a common—and often essential—way to establish knowledge. *Second*, the court erred in refusing to consider what a party should have known or could have discovered through reasonable diligence. Excusing a lack of due diligence contravenes the statutory requirement of showing "extraordinary circumstances" to vacate a referral. And, *third*, requiring knowledge of the "true nature" and "full extent" of a relationship creates a vague and virtually impossible burden to satisfy. Neither this Court's prior decision nor any other consideration justifies this novel and unmeetable knowledge standard.

Adopting the district court's standard will have far-reaching and harmful consequences. It will encourage litigants to stick their heads in the sand, delay

investigations, and withhold challenges to magistrate judges until after they read a judge's ruling—exactly the wrong incentives. At the same time, it will impose an impossible disclosure burden on magistrate judges and subject them to invasive discovery into their personal lives by disgruntled litigants. None of that can be squared with section 636(c)(4)'s "extraordinary circumstances" requirement.

II.     Under a proper knowledge standard, the Port's motion to vacate fails.

The record on remand overwhelmingly refutes the Port's contention that it had no idea Judge Kay and Monk's relationship extended beyond the fact that Monk's daughter was clerking for Judge Kay. Indeed, the evidence showed that the Port's own general counsel was active Facebook friends with Judge Kay and even "liked" a Facebook post that contained the exact same photos that the Port later used to seek vacatur after losing at trial. This is smoking-gun evidence of knowledge. The Port's own attorneys had also known and socialized with Judge Kay and Monk for decades and thus knew about the relationship. And Judge Kay and Monk even asked about and referred to each other's children in familiar terms during open proceedings in this case. The Port's argument that it had no idea—none!—that Judge Kay and Monk's relationship extended further than the fact that Monk's daughter was clerking for Judge Kay is utterly belied by this evidence.

Moreover, there was no longstanding "deep" or "intimate" friendship between Judge Kay and Monk, anyway. The district court's findings simply show that Judge

Kay and Monk were acquaintances in a small community whose lives intersected and whose families socialized from time to time. There was *no* evidence of a single private dinner between Judge Kay and Monk, and they attended no more than seven group dinners over the course of a *decade* prior to the trial. Monk was friends with Judge Kay's husband, who died in 2023, which explains his role as a backup groomsman in the 1989 wedding. Judge Kay, Monk, and even Norman's wife all made clear that Judge Kay and Monk were not *deep* or *intimate* friends—or even friends at all, as Judge Kay herself testified. The district court's contrary conclusion was based on its erroneous legal standard and flies in the face of the evidence.

**III.** This Court should reverse the decision below, reinstate the judgment, and resolve the issues presented by the Port's prior appeal.

## STANDARD OF REVIEW

A decision granting a motion to vacate a magistrate-judge referral is reviewable for abuse of discretion. *IFG*, 82 F.4th at 414. Under this standard, this Court reviews legal rulings de novo, factual findings for clear error, and discretionary determinations for abuse of discretion. *See Spectrum Ass'n Mgmt. of Tex., L.L.C. v. Lifetime HOA Mgmt. L.L.C.*, 5 F.4th 560, 563-64 (5th Cir. 2021). The Court undertakes de novo review of "strictly legal" questions regarding the application of a legal standard to a given set of factual findings. *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 368-71 (5th Cir. 2004).

## ARGUMENT

## I. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY ADOPTING A HEIGHTENED ACTUAL-KNOWLEDGE STANDARD

### A. The Knowledge Standard Under 28 U.S.C. § 636(c)(4) Must Account For Statute, Precedent, And Analogous Contexts

As the party seeking to vacate the referral of this case to a magistrate judge, the Port must "show[] extraordinary circumstances." 28 U.S.C. § 636(c)(4). Here, the Port bears the burden of "show[ing] [its] consent was obtained involuntarily," *Carter v. Sea Land Servs., Inc.*, 816 F.2d 1018, 1021 (5th Cir. 1987), because it was not "*knowing*," *IFG Port Holdings, L.L.C. v. Lakes Charles Harbor & Terminal Dist.*, 82 F.4th 402, 414-16 (5th Cir. 2023) (emphasis added). To the extent there is doubt as to whether the Port's consent was involuntary, the Port's motion fails.

In general, "knowledge" is "awareness or understanding of a fact or circumstance." *Knowledge*, *Black's Law Dictionary* (12th ed. 2024). The meaning of "knowledge" and the method through which it must be proven vary with context. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 185, 189 (2020).

Someone has "'actual knowledge' of a piece of information" if they are "in fact ... aware of it." *Sulyma*, 589 U.S. at 184; *see Actual Knowledge*, *Black's Law Dictionary*, *supra*. Actual knowledge can be proven by direct evidence, such as "the testimony of the individuals" whose "state of mind" is at issue. *Colonial Stores, Inc. v. FTC*, 450 F.2d 733, 744 (5th Cir. 1971). But because admitting knowledge is

usually detrimental to a litigant, knowledge is "*almost always* … proved" through "circumstantial evidence."  *United States v. Santos*, 553 U.S. 507, 521 (2008) (emphasis added).  A party can also be "'treated as having "knowledge" of the facts as they are ultimately discovered to be'" when he "'deliberately "shut[s] his eyes" to avoid knowing what would otherwise be obvious to view.'"  *United States v. Restrepo-Granda*, 575 F.2d 524, 528-29 (5th Cir. 1978) (citation omitted).

Actual knowledge is not the only relevant form of knowledge.  Constructive knowledge is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person."  *Constructive Knowledge*, *Black's Law Dictionary*, *supra*; *see Sulyma*, 589 U.S. at 185 (similar); *Herbst v. Scott*, 42 F.3d 902, 906 (5th Cir. 1995) (litigant who "should have known" about his claims had "constructive knowledge" of them).  Constructive knowledge is often found when a party is on "inquiry notice"—that is, "when [a party knows] information would lead an ordinarily prudent person to investigate the matter further."  *Inquiry notice*, *Black's Law Dictionary*, *supra*.

The knowledge standard for motions to vacate magistrate-judge referrals must be consistent with the statutory requirement for vacating such referrals (28 U.S.C. § 636(c)(4)), precedent applying that requirement, knowledge standards in analogous contexts, and the need to deter gamesmanship by litigants.  These factors

point in favor of (1) permitting reliance on circumstantial evidence, and (2) considering what a reasonably diligent party would have known.

*Statutory Text.* Section 636(c)(4) requires a party seeking to vacate its consent to the referral of a case to a magistrate judge to show "extraordinary circumstances." 28 U.S.C. § 636(c)(4); *see* Fed. R. Civ. P. 73(b)(3). This is a high standard. And the Supreme Court has long recognized that when "the basis for relief in [a] case is extraordinary," it is "[o]f particular importance" that a litigant *did not* display "neglect or lack of due diligence." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988) (litigant could not have discovered district judge's conflict of interest from the "public record at the time the case was tried and decided").

Just weeks ago, the Supreme Court, in interpreting a judicially imposed "extraordinary circumstances" requirement under Federal Rule of Civil Procedure 60(b), "underscored the stringency of the 'extraordinary circumstances' test," and reiterated "the importance of [the] movant's faultlessness." *BLOM Bank SAL v. Honickman*, 605 U.S. \_\_\_, 145 S. Ct. 1612, 1620 (2025). A litigant who fails to discover facts it should have known is *not* "completely without fault for his or her predicament," *id.* (quoting 12 *Moore's Federal Practice* § 60.48[3][b] (3d ed. 2024))—and therefore is not entitled to "extraordinary" relief.

*Precedent.* As the cases cited in this Court's prior decision show, courts applying the extraordinary circumstances requirement to requests to vacate

magistrate-judge referrals consider both (1) circumstantial evidence of knowledge and (2) what a reasonable litigant in the same situation *should* have known.

First, in *United States v. Dobey*, criminal defendants "voluntarily consented to be tried" by a magistrate judge. 751 F.2d 1140, 1141 (10th Cir. 1985). But defendants later "contend[ed] that neither they nor their trial counsel were aware that magistrates lacked the attributes of Article III judges." *Id.* at 1142. Notwithstanding defendants' assertion that they did not understand this fact, the Tenth Circuit held that defendants "knowingly waived their right to trial before the district court." *Id.* at 1143. In other words, the court held that the defendants' consent to trial before a magistrate judge was voluntary because they *should* have known about the magistrate's non-Article III status—and that was sufficient to "knowingly" waive their constitutional right to trial before an Article III judge.

Second, in *Norris v. Schotten*, a *pro se* habeas petitioner "signed a consent form agreeing to" proceed before a magistrate judge. 146 F.3d 314, 322 (6th Cir. 1998). The petitioner argued that the waiver "cannot be considered knowing and intelligent because he was uncounseled." *Id.* at 326. The Sixth Circuit disagreed. In doing so, the Sixth Circuit relied on the fact that this was petitioner's "second" habeas petition and he had previously "declined" to sign a waiver. *Id.* Rather than accept the petitioner's assertions about his state of mind, the court concluded that the petitioner must have been "fully aware that he had such a right given his prior

experience," *id.*—a determination that is necessarily grounded in either a constructive-knowledge standard (the petitioner *should* have known from his experience), or an inference based on circumstantial evidence (the petitioner *did* know from his prior experience, even though there was no direct evidence).

*Analogous Contexts.* In three directly analogous contexts where knowledge is required, this Court has assessed whether a litigant has forfeited a challenge to a decisionmaker based on constructive knowledge.

First, in the context of judicial recusals, "when the party seeking recusal knows *or should know* of the facts on which recusal is based he must make a timely motion to disqualify or lose his right to do so." *Kerns v. First State Bank of Ben Wheeler (In re Kerns)*, 130 F.4th 455, 464 (5th Cir. 2025) (emphasis added) (citation omitted). In *Kerns*, a litigant forfeited his argument that a judge should have recused himself because the judge had previously represented a different party in the underlying proceedings. *Id.* at 463-64. Because the judge's prior involvement was "not hidden" but instead easily accessible to the complaining party, this Court held that "failure to raise the issue" precluded later relief. *Id.*; *United States v. Whorley*, 550 F.3d 326, 339 (4th Cir. 2008) (relying on defendant's "lack of diligence" in denying recusal motion filed after the case was decided). Recusal challenges closely parallel motions to vacate referrals based on allegedly unknown social connections,

and the Port's motion to vacate here expressly relied on the "statute, jurisprudence and ethical rules" governing recusal.  ROA.22914-15; *see* ROA.22920.

Second, this Court has similarly held that a party waives a juror-disqualification challenge when "by reasonable diligence" the basis for that challenge "could have been discovered before verdict."  *United States v. Wilson*, 116 F.3d 1066, 1086 (5th Cir. 1997) (citation omitted), *vacated in part on other grounds sub nom.*, *United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998); *see Sheehan v. Whitley*, 110 F.3d 794, 1997 WL 119894, at *9 (5th Cir. Mar. 11, 1997) (denying habeas claim where petitioner's trial attorneys "failed to use reasonable diligence to" investigate juror's status under the circumstances).

Third, in the arbitration context, this Court has made clear that a party "waives an objection to an arbitrator's conflict of interest if the party has constructive knowledge of the conflict at the time of the arbitration hearing but fails to object."  *Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320, 322 (5th Cir. 2019).  When a ground for objection can be discovered by "running a brief internet search," a litigant's belated challenge will fail.  *Id.* at 322-23; *Shaffer v. Priority One Bank*, No. 15-cv-304, 2021 WL 2386824, at *12 (S.D. Miss. June 10, 2021) (refusing to vacate arbitration award where bank's own "readily accessible" records were "sufficient to put [it] on notice" of prior financial relationship with arbitrator), *aff'd*, No. 21-60802, 2023 WL 2706907 (5th Cir. Mar. 29, 2023).  This standard readily translates to the

magistrate-judge consent context, because in both contexts, parties are consenting to proceed before a particular decisionmaker who is not an Article III judge.

*Litigation Incentives.* The knowledge standard that governs challenges to magistrate-judge referrals cannot reward a lack of diligence and awareness by a losing litigant. For example, this Court has sensibly rejected a recusal rule that would "encourage[]" a litigant "to delay making a [recusal] motion as long as possible if he believes that there is any chance that he will win at trial," knowing that "[i]f he loses, he can always claim the judge was disqualified" and get a do-over. *Delesdernier v. Porterie*, 666 F.2d 116, 121 (5th Cir. 1982). And this Court has chosen knowledge standards precisely because they "discourage[]" a party "from ignoring or failing to investigate a possible conflict of interest." *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 803 (5th Cir. 1986) (applying constructive-knowledge standard), *aff'd*, 486 U.S. 847 (1988). It should do the same when selecting the knowledge standard applicable under section 636(c)(4).

## B. The District Court's Heightened Actual-Knowledge Standard Is Fundamentally Incompatible With These Principles

The district court here ratcheted up the test for knowledge in three ways, which are each unwarranted and together combine to create an insurmountable burden for establishing knowledge of a claimed relationship.

1. The district court held that the Port's "actual knowledge" could only be demonstrated through "direct evidence." ROA.29115. In rejecting the new

Facebook evidence, for example, the district court concluded that it "fail[ed] to demonstrate actual knowledge" because "there is no *direct* evidence that [Dees] saw any of the pictures" of Monk at Judge Kay's 1989 wedding. ROA.29115; *see* ROA.28886 ("Norman did not attend Judge Kay's 1989 wedding or Lucie's 2015 wedding" and "therefore did not have *first-hand* knowledge" of Monk's and Judge Kay's roles (emphasis added)). In restricting proof of actual knowledge to direct evidence, the district court ignored that "the 'usual ways' to prove actual knowledge" include an "'inference from circumstantial evidence,'" *Sulyma*, 589 U.S. at 189 (citation omitted), or a showing of willful blindness, *supra* at 33, because parties "do not readily admit" knowledge that will be detrimental to their cases, *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015); *see United States v. Morin*, 627 F.3d 985, 999 n.4 (5th Cir. 2010) ("A [party's] state of mind cannot ordinarily be proved by direct evidence, and circumstantial evidence will suffice.").

2.     The district court expressly rejected the constructive-knowledge standard, holding that "only actual knowledge of a relationship suffices for knowing and voluntary consent to a magistrate judge." ROA.28897; *see* ROA.28900 ("analyz[ing] … actual knowledge of the Judge Kay-Monk relationship"); ROA.29113-14 (requiring "actual knowledge"). That holding overlooks Congress's adoption of an "extraordinary circumstances" requirement for vacating magistrate-judge referrals, disregards the use of constructive knowledge in closely analogous

contexts, and allows a movant to vacate a trial result it does not like even where it *unreasonably* or even *intentionally* fails to pursue information they could have discovered through reasonable diligence before consenting.

In rejecting a constructive-knowledge standard, the district court dismissed the case law applying such a standard in the analogous contexts discussed above as "factually and contextually distinct." ROA.28897-98. But the court offered no real analysis or explanation for that observation. The court also pointed to the fact that this Court's prior opinion referred to "what the Port 'knew,' 'learned,' 'discovered,' and 'found out.'" ROA.28899 (citation omitted). But that proves nothing. Constructive knowledge *is* "knowledge," and "discovery" can "encompass[] not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." *Sulyma*, 589 U.S. at 185 (citation omitted).

Last, the district court surmised that "adopting a constructive knowledge standard" could have concerning "practical implications." ROA.28899. The court posited that under such a standard the Port would have constructive knowledge of Judge Kay's relationship with Monk simply "because one of its outside counsel occasionally engages in professional banter with the magistrate judge about the legal community." ROA.28900. But that policy concern conflates whether constructive knowledge is the correct legal standard with the proper *application* of that standard. A finding of constructive knowledge cannot be based on unreasonable inferences.

*Cf. Monster Energy Co. v. City Beverages, LLC*, 940 F.3d 1130, 1135 (9th Cir. 2019) (party lacked constructive knowledge where information was not obtained "through public sources"). And, in any event, the more pressing concern is a knowledge standard that excuses a party's lack of diligence and thus invites sandbagging.

3. The district court heightened the standard still further by holding that actual knowledge must exist as to the "full extent" and "true nature" of an alleged relationship. ROA.28881 n.84, 28886 n.94, 28893. In other words, it made the *object* of the knowledge requirement something that is fundamentally unknowable. A party may have significant knowledge of the facts surrounding a particular relationship, but still claim that they did not have an understanding of the "full extent" of a relationship or its precise level of "'intimacy.'" ROA.28881 n.84, 28897 (citation omitted). Indeed, the two parties to a relationship often have different perceptions of the "true nature" or "full extent" of a relationship, to say nothing of what a third party might conclude. Requiring direct evidence that a consenting party knew of the "full extent" or "true nature" of a relationship erects a vague and completely impractical requirement.

In an ordinary case, *each* of the requirements imposed by the district court will be exceptionally difficult for the non-moving party to overcome. Together, they make vacatur all but inevitable whenever a movant claims to lack knowledge, or merely denies recollection, of a relationship. The end result is that a movant who

ignores or denies knowledge of obvious, readily accessible information nonetheless may be rewarded with a do-over of a trial they lost. That is fundamentally out of step with the normal way in which challenges to a decision-maker's authority are adjudicated, and it cannot be reconciled with Congress's clear instruction that vacatur of magistrate-judge referrals be reserved for "extraordinary circumstances."

## C. The District Court's Heightened Standard Would Invite Gamesmanship And Create A Disclosure Nightmare For Judges

The district court's heightened standard would open a Pandora's box. The standard—and particularly the refusal to consider a party's lack of diligence in discovering available facts—will invite sandbagging. A party who might suspect or know of additional social or professional connections between a magistrate judge and opposing counsel that were not disclosed could hold back and see how a trial goes first. Then, if the result is unfavorable, the party could "scour[] the internet" for or otherwise uncover connections that were not disclosed; if there were any such connections, the party could claim that it lacked direct knowledge of the full extent of the relationship, and thus argue that a referral should be vacated. *Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 150 (3d Cir. 2015).

The standard also would create a disclosure nightmare for magistrate judges. To head off future litigation, a magistrate judge would be required to study their past interactions with attorneys who appear before them and put even the most mundane connections on the record to ensure that a party cannot later say that it lacked

specific, actual knowledge of a connection that undermined its consent. And when challenges to referrals are made, magistrate judges will routinely be subjected to burdensome and intrusive discovery about private sentiments and acquaintances. Invasive inquiry into magistrate judges' personal lives would become a routine phase of litigation, turning magistrate-judge referrals into ticking time bombs subject to thirteenth-hour motions to upset a ruling—like the one below—following years of litigation. Nothing in section 636(c)(4) remotely requires such disruption.

## II. UNDER ANY PROPER KNOWLEDGE STANDARD, THE PORT HAD SUFFICIENT KNOWLEDGE ABOUT THE RELATIONSHIP BETWEEN JUDGE KAY, MONK, AND THEIR FAMILIES LONG BEFORE JUDGE KAY RULED AGAINST THE PORT

Under any proper knowledge standard, the district court's own factual findings establish that the Port had adequate knowledge of the relationship between Judge Kay and Monk long before the Post-Trial Order issued. The district court's legal error in applying its flawed knowledge standard is a sufficient basis to reverse the decision below. But to the extent this Court concludes that the district court's decision turns on factual findings regarding the Port's knowledge or Judge Kay and Monk's friendship, the district court's findings are clearly erroneous because they are internally inconsistent, inextricable from the district court's erroneous legal standard for knowledge, and against the weight of the evidence. *Supra* at 30.

**A.    The Record Contains Ample Evidence Establishing The Port's Knowledge Of The Relationship Between Judge Kay And Monk**

The district court's own factual findings (summarized below) amply establish that the Port had adequate knowledge of the relationship between Judge Kay and Monk before the Post-Trial Order issued, as well as Monk's participation in Judge Kay's 1989 wedding and Judge Kay's participation in Lucie Monk's 2015 wedding.

*Facebook Posts.*  Judge Kay's public Facebook posts informed the Port of Judge Kay and Monk's social connections and, indeed, of Monk's involvement in the weddings that were the focus of the Port's motion.

Both Judge Kay and Monk were Facebook friends with Michael Dees, the Port's then-general counsel.  ROA.29108 (Dees and Judge Kay became Facebook friends in 2009).  Judge Kay and Monk's posts were thus part of Dees's Facebook News Feed, a "continually updating stream of other users' posts" that is "personalized" for users through algorithms that track "expressed interests and past activities."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 734-35 (2024).

Significantly, Dees "liked" a Facebook post containing photos of Judge Kay's 1989 wedding.  *Supra* at 21.  That post included the exact same photos that the Port relied on in seeking to vacate the referral based on the Port's purported lack of knowledge of Monk's participation in Judge Kay's 1989 wedding.  Dees's interaction with that post is true, smoking-gun evidence of the Port's knowledge.

Moreover, Dees's "like" of Judge Kay's post containing her 1989 wedding photos was no fluke, because he regularly engaged with Judge Kay's Facebook content. Dees actively used Facebook and interacted with Judge Kay's Facebook profile through likes, comments, and messages, including interactions after the litigation began in January 2016. ROA.28937-38. Dees also emailed Matt Mize and Joe Mize about Judge Kay's Facebook activities in March 2017, ROA.28887; ROA.45209 (stating "From Facebook, it appears that Judge Kay is in Bath, England"), and told them about Judge Kay's Facebook activity during the trial. ROA.28887. And Dees even Facebook messaged and emailed Judge Kay on multiple occasions. ROA.28887-88. Given Dees's frequent interactions with Judge Kay on Facebook, Dees must have been aware of Judge Kay's annual Facebook posts of her wedding photos on her anniversary, which show Monk's participation as a groomsman. *Supra* at 21-26 (photos).

Judge Kay's officiation of Lucie Monk's 2015 wedding was also publicized on Facebook. ROA.45162-64; ROA.45166. As with the 1989 wedding photos that Dees liked, posts in which Judge Kay was tagged would have likewise appeared on Dees's Facebook News Feed. Indeed, Maura Mize and Polly Norman—wives of the Port's counsel—both liked photos that showed Judge Kay officiating Lucie Monk's 2015 wedding. *Supra* at 15-16. The Port's suggestion that it had no idea about a

social connection (whatever its significance) broadcast publicly on Facebook in photos liked by its own attorneys' wives simply defies belief.

The district court also stated that it would be "absurd" for Dees to have "had critical knowledge of the Judge Kay-Monk relationship from her Facebook page" but "let his team proceed onward in ignorance." ROA.29115. That reasoning assumes the conclusion that this was, in fact, new or "critical" information. More likely, the Port already knew about these connections and did not consider them problematic. Indeed, even after the Port's attorneys "discovered" these facts, Norman did *not* "see grounds for recusal," ROA.28864-65, and none of the Port's attorneys "even thought of trying to vacate the referral" on this basis, ROA.28859-60, 28870. They knew there was no "there there." It was only after new attorneys—from out of town—were retained that the Port made a last-ditch effort to take the case away from Judge Kay. ROA.22906-07, 28870. Dees's conduct was thus just as consistent with the conclusion that he knew but *thought it was unimportant* that Monk was a groomsman in a wedding over thirty years before this case was decided, as it was with the conclusion that he was ignorant of this fact.

Regardless of the plausibility of Dees's testimony, it is undeniable that a quick investigation would have revealed that Monk served as a groomsman at the 1989 wedding and that Judge Kay officiated Lucie Monk's 2015 wedding. Indeed, on the same day Maura Mize "decided to look Judge Kay up on Facebook," she

"discovered" the Facebook photos on which the Port's motion to vacate ultimately relied. ROA.28864-65. That is all it took to uncover the supposed "deep" and "intimate" friendship hiding in plain sight. The ease with which Port counsel's wives found out about these connections underscores that the information that the Port claims was hidden was in fact easily accessible.

*Social Connections.* The Port also knew or should have known of Judge Kay and Monk's relationship because Judge Kay, Monk, the Port's counsel, and their families have traveled in the same social circles and attended many of the same social functions in the small community of Lake Charles for decades.

In 2017, Rick Norman and his wife, Polly, walked into the wedding of Judge Kay's daughter with Monk and his wife, Aimee. ROA.28884. Norman thus knew that Monk, like him, was among the fifty or sixty people invited to the wedding. ROA.33458. Norman also knew of Monk's conversation with Judge Kay about "how to become a federal judge." ROA.28876-77 & n.78. The district court said this conversation "demonstrate[d]" Monk's "trust" in Judge Kay, *id.,* but Judge Kay gossiped to Norman about it—hardly something a true friend would do, and, in any event, that disclosure to Norman betrayed any "trust" that Monk had in Judge Kay.

Attorneys on both sides of this case and their families have crossed paths with one another and Judge Kay and her family for decades in Lake Charles. Polly Norman hosted a pre-wedding event for—and attended—Lucie Monk's wedding.

ROA.28884. Polly Norman knew months before Lucie's wedding that Judge Kay would be officiating. ROA.34041-42. Joe and Maura Mize—along with Rick and Polly Norman—were invited to Lucie Monk's wedding. ROA.28889. After Lucie's wedding, Maura Mize and Polly Norman liked a photo showing Judge Kay officiating Lucie Monk's wedding. ROA.28889. And in 1992, Judge Kay, the Normans, and the Monks, all attended the wedding and pre-wedding events of Rick Norman's sister-in-law, Patti Palmer Stark. ROA.28882. Polly Norman was matron of honor, Judge Kay was a bridesmaid, Rick Norman was a groomsman, and the Monks were guests. ROA.28882.

Judge Kay, the Monks, and the Normans also had children in the same schools. Judge Kay's children attended the same elementary and high schools as the children of the attorneys in this case. ROA.34034-36. As Judge Kay testified, Lake Charles is a "very small town," and "all of the families" whose children attend St. Louis Catholic High School "know each other almost to the extent where it's too much information." ROA.33288. Dees himself similarly testified that if someone lives in Lake Charles "long enough," they "pick up on things." ROA.33967.

This evidence—reflected in the district court's own factual findings—is fatal to the court's conclusion that the Port "*first* learned that Judge Kay's relationship to Monk extended beyond her employment of Margaret as her law clerk" after the Post-Trial Order when Maura Mize searched Judge Kay's public Facebook page.

ROA.28891 (emphasis added). That conclusion was wrong at the time of the referral and became unfathomable when the Port retained Norman prior to trial. Norman's knowledge was automatically imputed to the Port—and yet he did not bat an eye at trying the Port's case against Monk's client before Judge Kay. This is important because this Court made clear in the prior appeal that "even if [the Port] discovered [that Judge Kay and Monk had a relationship] shortly before [Judge Kay] issued her order, the 'delay' factor would likely doom its claim now." *IFG*, 82 F.4th at 419.

*Proceedings In This Case.* It is undisputed that the Port knew that Monk's daughter Margaret worked as Judge Kay's law clerk. ROA.45172-73 (Joe Mize); ROA.45159 (Norman). Of all the connections alleged by the Port that bear on the possibility that Judge Kay could have been influenced by Monk, that is the one alleged connection that could have raised a question about recusal. Yet, the Port—knowing this—consented to have Judge Kay preside over the trial.

There is also no dispute that Joe Mize and Matt Mize knew that Monk and Judge Kay were familiar with one another's children based on their conversations during status conferences. ROA.28851 & n.12. When Monk asked Judge Kay "how's Robbie doing" and "how is Sally doing," Judge Kay "would ask the same thing about some of [Monk's] children." ROA.33426 (Monk testifying that "there was almost always" discussion like this during in-person status conferences). People who do not know each other's families do not talk like that.

The record underscores that everyone involved in this case was a repeat player in the Lake Charles legal community. ROA.33339; ROA.34081. In 2016, before Norman joined the Port's legal team, he emailed Judge Kay about how Port counsel Joe Mize told him that during a hearing in this case, Judge Kay saved Mize from "'getting "monked,"'" which was "'a recognized verb in the lexicon of the local legal community.'" ROA.28883 (citation omitted). It is difficult to fathom that Norman knew Monk and Judge Kay well enough to joke about Monk's reputation in the local legal community yet somehow knew nothing—*nothing*—about Monk's connections with Judge Kay. The record overwhelmingly refutes the notion that the well-connected veterans of Lake Charles's legal community who represented the Port, such as Norman and Joe Mize, did not know that Judge Kay and Monk's connections extended beyond Margaret Monk's clerkship.

*Timeline.* To summarize, the following timeline highlights a few of the facts showing that the Port knew or should have known that Monk's relationship with Judge Kay extended beyond Margaret Monk's clerkship, including with respect to the 1989 and 2015 weddings that were the subject of the Port's motion:



| 1989 | **July** | Judge Kay marries Scott McPherson, a friend of Monk's. *See supra* at 14-15, 21. |
| 1995 | **January** | Mike Dees becomes the Port's general counsel. *See supra* at 9. |
| 2014 | **July** | Judge Kay begins annually posting photos of her 1989 wedding on her Facebook account; Dees likes the post. *See supra* at 21, 23. |
| 2015 | **October** | Judge Kay officiates Lucie Monk's wedding. *See supra* at 15-16. Polly Norman helps organize pre-wedding event. *See supra* at 15. |
| 2016 | **January** | IFG commences this litigation. *See supra* at 9. In subsequent status conferences attended by Port counsel, Judge Kay and Monk refer to each other's children in familiar terms. *Id.* at 18. |
| | **May** | Norman emails Judge Kay about saving Joe Mize from "getting 'monked.'" *See supra* at 49. |
| | **July** | Judge Kay posts wedding photos, including cover photo depicting Monk. *See supra* at 23-24. |
| 2017 | **January** | Parties consent to magistrate-judge referral. *See supra* at 10. |
| | **June** | Judge Kay changes profile picture to photo including Monk. *See supra* at 25. |
| | **After July** | Judge Kay tells Norman that Monk told her about aspirations to become an Article III judge. *See supra* at 18. |
| | **September** | Normans and Monks attend Judge Kay's daughter's wedding, walking into ceremony together. *See supra* at 17. |
| 2019 | **March** | Norman joins the Port's trial team. *See supra* at 10. |
| | **March/April** | Bench Trial. *See supra* at 10. |
| 2020 | **July** | Judge Kay issues Post-Trial Order. *See supra* at 10. |
| | **August** | Polly Norman says there is "no close friendship" between Monk and Judge Kay. *See supra* at 12. |
| | | Port retains new, non-Lake Charles counsel. *See supra* at 12. |
| | **October** | Port moves to vacate referral. *See supra* at 12. |
| 2024 | **April** | Monk and Judge Kay testify they are not close friends. *See supra* at 18. |
| | **August** | Judge Kay's reactivated Facebook account displays Dees's numerous past interactions with her page. *See supra* at 21, 25-26. |

### B. This Evidence Meets Any Reasonable Knowledge Standard Under 28 U.S.C. § 636(c)(4)

The evidence above establishes that the Port's consent was knowing and valid. This evidence readily satisfies an actual-knowledge standard that considers circumstantial evidence of the Port's knowledge. And at a minimum, the evidence shows that the Port had constructive knowledge. Either is legally sufficient.

The Facebook evidence alone is fatal to the Port's lack of knowledge argument. The Facebook activity of the Port's general counsel creates a compelling inference that long before the Port consented to the referral, let alone lost this case, it knew of Monk's participation in Judge Kay's 1989 wedding. Indeed, the evidence shows that Dees liked a post containing photos publicizing this very event. Short of a direct admission, there is no more compelling evidence than documentary proof showing engagement with the very information that Dees claimed to be ignorant of. And Dees's active engagement with Judge Kay's Facebook content over the course of years also supports an inference that he saw Judge Kay's annual posts of her 1989 wedding and posts of Lucie Monk's 2015 wedding in which Judge Kay was tagged.

The Port's knowledge—and particularly Rick Norman's knowledge—of Judge Kay and Monk's social connections leads to the same common-sense conclusion. Indeed, the district court's own reading of the record supports the conclusion that the Port had knowledge. The district court relied on Monk's conversation with Judge Kay about becoming a federal judge to conclude that Monk

"trust[ed]" Judge Kay. ROA.28876-77. But if that conversation demonstrates a relationship extending beyond Margaret Monk's employment as a law clerk, Norman's knowledge of that conversation necessarily means that Norman knew about the supposed "trust" that Monk had in Judge Kay. In other words, the district court credited information in Norman's possession as evidence of the closeness between Monk and Judge Kay, while ignoring that Norman was aware of that information (about the relationship between Monk and Judge Kay). That conclusion is internally inconsistent. *United States v. Apfelbaum*, 445 U.S. 115, 126-27 (1980).

The knowledge of the spouses of the Port's attorneys further undermines the Port's claim that it was in the dark about Judge Kay and Monk's connections. To be sure, family-member knowledge is not automatically imputed to the Port. But it is wholly implausible to believe that husbands and wives did not discuss events and relationships in a small community like Lake Charles. Indeed, when the Port first considered seeking to remove Judge Kay from the case, its attorneys turned to their spouses. The close connections between these families over decades in Lake Charles is strong circumstantial evidence that the Port's attorneys knew or should have known about the connections the Port later cited as reasons to vacate the referral.

In the face of all this, the district court gave virtually dispositive weight to the fact that the Port's witnesses "unequivocally denied any knowledge of this friendship." ROA.28900. But, by definition, a party moving to vacate based on lack

of knowledge will *always* proffer that they lacked knowledge. The court's task is to assess whether that proffer is plausible in light of all the evidence, including circumstantial evidence. The standard cannot require the non-movant to produce direct *admissions* of knowledge, which will almost never be available. Indeed, the way in which Dees's initial denials and lawyerly equivocations about his knowledge of Judge Kay and Monk's connections were refuted by the late-discovered Facebook evidence shows why this cannot be the standard.

At a minimum, the Port plainly had constructive knowledge, which alone should defeat its claim that it lacked knowledge. A reasonable litigant in the Port's position should have known that Monk participated in Judge Kay's 1989 wedding—a publicly disclosed fact that was discovered by Maura Mize the same day she began searching. Similarly, once Norman joined the Port's legal team—before the trial—Norman's extensive knowledge of Judge Kay and Monk's connections should have caused the Port to ask more questions about their relationship. And Joe Mize and Matt Mize were likewise put on inquiry notice by Judge Kay and Monk's conversations about their children during status conferences. The facts that were indisputably known to the Port's attorneys should have caused "enough bells" to go "off" to prompt further investigation. *GO Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007); *supra* at 32. If the Port had conducted a remotely diligent investigation—such as by asking Judge Kay and Monk how they knew each

other's children or conducting a brief search of Judge Kay's public Facebook page—it would have led straight to the information that the Port claims was undisclosed.

This record cannot demonstrate the "extraordinary circumstances" required to vacate the referral. 28 U.S.C. § 636(c)(4). The district court's contrary conclusion was driven by its flawed knowledge standard. That legal error requires reversal.

### C. There Was No "Deep" Or "Intimate" Friendship Between Judge Kay, Monk, And Their Families To Begin With

In the prior appeal, this Court explained that, regardless of the Port's knowledge of facts, the Port's consent would not be "unknowing" if Judge Kay and Monk did not have a "deep and longstanding" friendship. *IFG*, 82 F.4th at 417; *id.* at 420 (Port asserted an "undisclosed intimate friendship"). Here again, the evidence developed on remand defeats the Port's motion.

A "deep" or "intimate" friendship involves mutual respect, trust, and vulnerability. *See, e.g.*, *Harvest Church v. Resound Church*, No. 22-cv-2285, 2024 WL 5168125, at *3 (D. Colo. Dec. 19, 2024) ("heartfelt communications" about "personal issues" suggested "very close, personal and intimate bond"). The record here refutes such a relationship between Judge Kay, Monk, or their families. Indeed, Judge Kay stated that, while it was "not comfortable" for her to admit, she never considered Monk a friend of hers, rather than her husband's, and that she was not "very close friends" with Aimee Monk, either. ROA.28879; ROA.33279, 33380. Monk likewise testified that, while "[a]t one time" he considered the relationship

"close"—especially with Judge Kay's husband, McPherson—he did not consider the relationship to be "'intimate.'" ROA.33452. Monk's relationship with *McPherson* provides no basis to find a "deep" and "intimate" friendship between Monk *and Judge Kay*. *Cf. Woods v. Ampco Sys. Transp., Inc.*, No. 05-cv-2040, 2005 WL 8172100, at *2 (D. Colo. Dec. 5, 2005) ("a lawyer [being] a friend of the judge's spouse" does not create an appearance of impropriety).

Judge Kay's actions are even more telling. When Monk told Judge Kay about his hopes of becoming a federal judge, Judge Kay "gossiped about Monk's ambitions" with Norman, ROA.28877 n.78, because Judge Kay knew that Norman had "negative" feelings toward Monk and it was not Judge Kay's "preference either" for Monk to become a district judge. ROA.33345-46. If there was any "trust on Monk's part," ROA28877, Judge Kay did not share it. That kind of gossip and betrayal belies an intimate friendship. Other testimony and evidence corroborated the *lack* of any close friendship. Judge Kay's career law clerk, Elaine Solari, testified that she did not think that Judge Kay had a "close intimate relationship" with Monk. ROA.34078. After the Post-Trial Order issued, Norman's wife, Polly, told Norman there was "no close friendship" between Judge Kay and Monk. ROA.28865; *see* ROA.28882-83 (Polly Norman acknowledging friendship with Aimee Monk and involvement in preparations for Lucie Monk's wedding).

In the prior appeal, this Court "accepted" the Port's assertions about Judge Kay and Monk's relationship as true, but it made clear that, on remand, the Port would have to prove that "Judge Kay's friendship with the Monks was, in fact, 'deep' and 'personal.'" *IFG*, 82 F.4th at 418-21. The Port has not met that burden. Monk's participation in Judge Kay's 1989 wedding as her husband's backup groomsman does not suggest an intimate friendship with Judge Kay, much less one that was deep and intimate—then or especially *decades later*. And it is unremarkable that the Monks asked a "local judge" who currently employed the bride's sister as a law clerk to "perform[] a civil [wedding] ceremony"; given that Margaret Monk was clerking for Judge Kay at the time, she was a natural choice. ROA.33428. This Court observed that it was "[p]uzzling[]" that Judge Kay would disclose that Monk's daughter was clerking for her and "stop[] there." *IFG*, 82 F.4th at 417. But not if, as the evidence showed, there was no "intimate" relationship between Judge Kay and Monk. The Port made that theory up the minute its new counsel decided that their only hope was to challenge the referral.

As this Court itself acknowledged in the prior appeal, friendships between judges and litigants are not uncommon—or disqualifying. The exception is where the friendship rises to the level of a "brother and sister"-like or "near-paternal" relationship. *Id.* at 418 (citations omitted) (citing cases). Judge Kay and Monk did not have anything like that. Indeed, they never dined together one-on-one at all; they

had seven meals together in groups over the course of the 2010s; and Judge Kay gossiped and made fun of Monk to others, including Norman.

It might take a philosophy class to discern the "*true nature*" of Judge Kay's relationship with Monk. But it is clear, on the record developed below, that Judge Kay and Monk did *not* have a "deep" and "intimate" relationship.

## III.  REGARDLESS OF THIS APPEAL'S OUTCOME, THIS COURT SHOULD PROVIDE GUIDANCE FOR FURTHER PROCEEDINGS

For the reasons discussed above, this Court should reverse the district court's order granting the Port's motion to vacate, and the judgment and orders underlying it should be reinstated. This Court should then resolve the outstanding "issues relating to the liability and damages findings" raised by the Port in its prior appeal, which the Court did not reach. *IFG*, 82 F.4th at 421 n.10. This panel should either resolve those issues based on the parties' prior briefing, or this Court should set the case for further consideration based on that briefing.

But if the Court disagrees with IFG, this case should be remanded for further proceedings before Chief Judge Terry Doughty in the Western District of Louisiana, who handled the case after the motion to vacate was filed. This case wended its way to Judge Truncale—from the Eastern District of Texas—to conduct the inquiry this Court directed on remand only because all Western District of Louisiana judges were recused by en banc order of the Court, given that the remand focused on a former

magistrate judge in the Western District of Louisiana. But now that this inquiry is complete, there is no longer a need for a district-wide recusal order.

Instead, this case should proceed in the ordinary course in the Western District of Louisiana—where the parties, witnesses, and evidence are located. Indeed, Judge Truncale observed that "conducting the evidentiary inquiry in Lake Charles was quite inconvenient and at times complicated for the undersigned and his staff." ROA.28816 n.3. Moreover, there is an undue risk that the nature of the evidentiary proceedings—which were separate from the merits—would color a judge's perception of the parties and any further proceedings on the merits.

Events during the evidentiary inquiry also counsel in favor of conducting any further proceedings in front of a different judge. When IFG moved for relief from the evidentiary proceeding below based on the unusual interactions among Judge Truncale, recused Judge James D. Cain, Jr., and the Port's lawyers, Judge Truncale used unusually harsh language in rejecting IFG's motion, ROA.28834-35, and Judge Cain took the extraordinary step of calling IFG's motion "ridiculous" *in a legal publication*, ROA.28812-13.[1] Because this dispute arising out of an unusual proceeding should not color a court's views about the parties going into any further proceedings, a new judge should oversee any further proceedings.

---

[1] IFG's motion describing these events is available at ROA.28763-84.

Finally, if this Court remands for further proceedings, Judge Kay's prior orders, findings, and conclusions may be construed as reports and recommendations that are subject to the parties' objections and review by the district court. *See Ashker v. Newsom*, 968 F.3d 975, 985 (9th Cir. 2020). The parties and court have already expended massive resources in trying this case over the course of a decade. If the case is remanded for further proceedings, the Post-Trial Order should be converted into a report and recommendation, which can be considered by the district court; there is no reason to disregard Judge Kay's analysis and findings.

In the end, though, this Court should reverse the decision below granting the Port's motion to vacate, resolve the remaining issues from the initial appeal, and affirm the judgment entered by Judge Kay following trial. The Port's motion to vacate was always designed to deflect attention from the real problem in this case— the Port's own illegal and extortionate conduct resulting in the ruling against it. The Port took its Hail Mary shot in the form of its motion to vacate the referral. But as the proceeding below confirmed, that shot—as they almost always do—fails.

## CONCLUSION

The district court's decision should be reversed.

Dated: June 26, 2025

Respectfully submitted,

*/s/ Gregory G. Garre*
Gregory G. Garre
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Samir Deger-Sen
Peter Trombly
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-4619
samir.deger-sen@lw.com
peter.trombly@lw.com
kristin.holladay@lw.com

Thomas M. Flanagan
FLANAGAN PARTNERS LLP
201 St. Charles Ave., Ste. 3300
New Orleans, LA 70170
(504) 569-0235
tflanagan@flanaganpartners.com

*Counsel for Plaintiff-Appellant IFG Port Holdings LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2025, the foregoing was electronically filed with the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Gregory G. Garre*
Gregory G. Garre

## ECF CERTIFICATION

I hereby certify (i) the required privacy redactions have been made pursuant to Rule 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to Rule 25.2.1; and (iii) the document has been scanned for viruses using Microsoft Defender and is free of viruses.

Dated:  June 26, 2025

*/s/ Gregory G. Garre*
Gregory G. Garre

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,883 words, including words appearing in images and excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  June 26, 2025                                    */s/ Gregory G. Garre*
                                                                  Gregory G. Garre