No. 24-30552

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**IFG PORT HOLDINGS LLC,**
*Plaintiff - Appellant*,

v.

**LAKE CHARLES HARBOR & TERMINAL DISTRICT,**
**doing business as PORT OF LAKE CHARLES,**
*Defendant - Appellee.*

On Appeal from the United States District Court
for the Western District of Louisiana (Lake Charles)
No. 2:16-CV-146 (Hon. Michael Joseph Truncale)

# PETITION FOR REHEARING EN BANC


Samir Deger-Sen
Peter Trombly
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-4619
samir.deger-sen@lw.com
peter.trombly@lw.com
kristin.holladay@lw.com

Gregory G. Garre
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Thomas M. Flanagan
FLANAGAN PARTNERS LLP
201 St. Charles Ave., Suite 3300
New Orleans, LA 70170
(504) 569-0235
tflanagan@flanaganpartners.com

*Counsel for Plaintiff-Appellant IFG Port Holdings LLC*


October 13, 2026

## CERTIFICATE OF INTERESTED PERSONS

***IFG Port Holdings LLC v. Lake Charles Harbor & Terminal District, doing business as Port of Lake Charles*, No. 24-30552**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

***Parties***

- IFG Port Holdings LLC
  *Plaintiff-Appellant*

- Lake Charles Harbor & Terminal District, doing business as Port of Lake Charles
  *Defendant-Appellee*

***Counsel (Current and Former) for Plaintiff-Appellant***

- Gregory G. Garre of Latham & Watkins LLP
- Samir Deger-Sen of Latham & Watkins LLP
- Peter Trombly of Latham & Watkins LLP
- Kristin C. Holladay of Latham & Watkins LLP
- James A. Tomberlin, then of Latham & Watkins LLP
- Marissa Marandola, then of Latham & Watkins LLP
- Thomas M. Flanagan of Flanagan Partners LLP
- Laura Kay Austin Theunissen of Mahtook & LaFleur LLC

- Charles A. Mouton of Mahtook & LaFleur LLC
- Laura Adams Alexander, formerly of Mahtook & LaFleur LLC
- K. Eric LaFleur of LaFleur & Laborde, LLC
- James Kee Irvin of LaFleur & Laborde, LLC
- Stephanie B. Laborde of LaFleur & Laborde, LLC
- William B. Monk of Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.
- Stephen Donald Polito of Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.
- Kathleen Thompson Deanda of Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.
- Peyton Frances Pawlicki, formerly of Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.

***Counsel (Current and Former) for Defendant-Appellee***

- Michael H. Rubin of Adams & Reese, L.L.P., formerly of McGlinchey Stafford PLLC
- Marcelle P. Mouledoux of Simon, Peragine, Smith & Redfearn, LLP, formerly of McGlinchey Stafford PLLC
- Douglas Jay Cochran of Stone Pigman Walther Wittmann L.L.C.
- Nicholas John Wehlen of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, formerly of Stone Pigman Walther Wittmann L.L.C.
- Monette M. Davis of Stone Pigman Walther Wittmann L.L.C.
- Michael Wendell McKay of Long Law Firm, L.L.P.
- Timothy Dylan Reeves, then of McGlinchey Stafford PLLC

- Matthew E. Lognion, then of Robichaux, Mize, Wadsack, Richardson & Watson, LLC
- Matthew Martin Mize of Robichaux, Mize, Wadsack, Richardson & Watson, LLC
- William J. Mize, then of Robichaux, Mize, Wadsack, Richardson & Watson, LLC
- Matthew Bond Pettaway of Taylor, Porter, Brooks & Phillips L.L.P.
- Merrick J. Norman, Jr. of Taylor, Porter, Brooks & Phillips L.L.P.

***Other (Not Already Listed)***

- Hon. W. Royal Furgeson, Jr. (ret.)
- Hon. Mildred E. Methvin (ret.)
- Hon. Brian Owsley (ret.)
- Hon. Viktor V. Pohorelsky (ret.)
- Hon. Stephen Wm. Smith (ret.)
- David R. Carpenter of Sidley Austin LLP
- Chelsea A. Priest of Sidley Austin LLP
- Norman Business Law Center LLC
- Farmers Rice Milling Co. Inc.
- Powell Group LLC
- Phillip Wade DeVilbiss of Kean Miller LLP
- John R. Pohorelsky of Scofield, Gerard, Pohorelsky, Gallaugher & Landry, LLC
- First Federal Insurance Services LLC

- Robert Joseph Tete of Jones Tete et al.
- Ross M. Raley of Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.
- Todd M. Ammons of Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.
- Christine Lipsey, then of McGlinchey Stafford PLLC

Dated: October 13, 2026

*<u>/s/ Gregory G. Garre</u>*
Gregory G. Garre

*Counsel for Plaintiff-Appellant*
*IFG Port Holdings LLC*

## RULE 40(b)(2) STATEMENT OF COUNSEL

This appeal involves a question of exceptional importance that will have far-reaching impacts on the administration of magistrate and bankruptcy proceedings across this circuit. Over a dissent by Judge Oldham, a divided panel held that a losing party may establish the "extraordinary circumstances" necessary to retroactively revoke consent to a magistrate-judge referral under 28 U.S.C. § 636(c)(4)—and thereby invalidate a judgment—whenever it lacks *actual* knowledge of a potential conflict of interest, rejecting a constructive-knowledge standard that would consider a party's neglect or lack of due diligence. Under the majority's actual-knowledge standard, a losing party may unwind a valid judgment—here, a $120-million-plus judgment rendered after a twenty-day trial—simply by claiming that it did not actually know the full nature or extent of a potential conflict based on information it uncovered after judgment was entered against it, regardless of how strong the circumstantial evidence of the party's knowledge is, and regardless of whether the party exercised due diligence.

As Judge Oldham explained, that standard conflicts with decisions of the Supreme Court holding that an "extraordinary circumstances" standard requires an inquiry into a party's faultlessness, *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 212 (2025); *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988); decisions of this Court considering belated attempts to challenge

decisionmakers, *Kerns v. First State Bank of Ben Wheeler (In re Kerns)*, 130 F.4th 455, 464 (5th Cir. 2025); *United States v. Wilson*, 116 F.3d 1066, 1086-87 (5th Cir. 1997), *vacated in unrelated part as recognized in United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998) (en banc); *Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320, 322 (5th Cir. 2019) (per curiam); and decisions of other circuits considering efforts to revoke consent to a magistrate-judge referral, *United States v. Dobey*, 751 F.2d 1140, 1142-43 (10th Cir. 1985); *Norris v. Schotten*, 146 F.3d 314, 326 (6th Cir. 1998). The majority decision here warrants rehearing en banc to resolve each of those conflicts.

As Judge Oldham and the amici former judges explained, the resolution of this question could hardly be more consequential. The majority's holding will provide a roadmap for invalidating countless final judgments by disappointed litigants who now need only proffer ignorance of a potential conflict—no matter how unjustified—to obtain a second bite at the apple. Under the majority's unworkable actual-knowledge standard, every magistrate-judge and bankruptcy-judge adjudication resting on party consent is at serious risk of revocation. Rehearing en banc is needed before this standard takes effect.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

RULE 40(b)(2) STATEMENT OF COUNSEL ........................................................ v

TABLE OF AUTHORITIES ........................................................ viii

STATEMENT OF THE ISSUE ........................................................ 1

INTRODUCTION ........................................................ 1

BACKGROUND ........................................................ 3

ARGUMENT ........................................................ 7

I. THE MAJORITY'S DECISION CONFLICTS WITH DECISIONS OF THE SUPREME COURT, THIS COURT, AND OTHER CIRCUITS ......... 7

II. IF ALLOWED TO STAND, THE MAJORITY'S DECISION WILL WREAK HAVOC ON THE ADMINISTRATION OF CONSENT JURISDICTION AND THE JUDGES WHO EXERCISE IT ...................... 11

CONCLUSION ........................................................ 16

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Heritage Life Insurance Co. v. Orr*,
294 F.3d 702 (5th Cir. 2002) ....................................................................9

*BLOM Bank SAL v. Honickman*,
605 U.S. 204 (2025)..................................................................................7

*Bowles v. OneMain Financial Group, L.L.C.*,
954 F.3d 722 (5th Cir. 2020) ....................................................................9

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009)..................................................................................9

*Carter v. Sea Land Services, Inc.*,
816 F.2d 1018 (5th Cir. 1987) ................................................................10

*IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal District*,
82 F.4th 402 (5th Cir. 2023) ......................................................................5

*Kerns v. First State Bank of Ben Wheeler (In re Kerns)*,
130 F.4th 455 (5th Cir. 2025) ....................................................................8

*Light-Age, Inc. v. Ashcroft-Smith*,
922 F.3d 320 (5th Cir. 2019) ....................................................................8

*Liljeberg v. Health Services Acquisition Corp.*,
486 U.S. 847 (1988)..................................................................................7

*Norris v. Schotten*,
146 F.3d 314 (6th Cir. 1998) ..................................................................10

*Pizza Hut L.L.C. v. Pandya*,
79 F.4th 535 (5th Cir. 2023) ......................................................................9

*United States v. Dobey*,
751 F.2d 1140 (10th Cir. 1985) ..............................................................10

*United States v. Wilson*,
116 F.3d 1066 (5th Cir. 1997), *vacated in unrelated part as recognized in United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) ....................................8

**Page(s)**

## STATUTES

28 U.S.C. § 157(c)(2) .......... 14

28 U.S.C. § 636(c)(4) .......... 1

## OTHER AUTHORITIES

Bill Rochelle, *Fifth Circuit Announces Rule for Broad Disclosure of Bankruptcy Judges' Relationships*, Am. Bankr. Inst. (Sept. 17, 2026), https://www.abi.org/newsroom/daily-wire/fifth-circuit-announces-rule-for-broad-disclosure-of-bankruptcy-judges .......... 14

Fed. R. App. P. 40(b)(2) .......... 1

Fed. R. App. P. 40(b)(2)(A) .......... 7

Fed. R. App. P. 40(b)(2)(B) .......... 7

Fed. R. App. P. 40(b)(2)(C) .......... 7

## STATEMENT OF THE ISSUE

Under 28 U.S.C. § 636(c)(4), a "court may … under extraordinary circumstances shown by any party, vacate a reference of a civil matter to a magistrate judge." The question presented is whether Section 636(c)(4)'s "extraordinary circumstances" test is governed by an actual-knowledge standard or a constructive-knowledge standard, when a losing litigant seeks vacatur of a referral based on a potential conflict it says came to light after an adverse ruling.

## INTRODUCTION

This case presents a fundamental question concerning the operation of an increasingly important component of the judiciary—the adjudication of cases by magistrate judges. A divided panel of this Court adopted a new legal rule for demonstrating the "extraordinary circumstances" necessary to revoke consent to magistrate-judge jurisdiction under 28 U.S.C. § 636(c)(4). That rule conflicts with precedent of the Supreme Court, this Court, and other circuits, and will unleash judicial chaos if allowed to take root. Dissent 23-32. All the traditional criteria for rehearing en banc are met. Fed. R. App. P. 40(b)(2).

Under the majority's decision, a litigant who claims not to "actually know the nature and extent of a magistrate judge's potential conflict" can respond to losing on the merits by moving to revoke its consent to magistrate-judge jurisdiction on the basis that it lacked *actual* knowledge of any potential conflict purportedly

discovered only after the loss and thereby undo the adverse result. Op. 12 (majority opinion). As Judge Oldham explained, the majority's actual-knowledge rule conflicts with (1) Supreme Court precedent holding that an "extraordinary circumstances" standard requires an inquiry into faultlessness; (2) this Court's caselaw holding that a constructive-knowledge standard governs analogous challenges to decisionmakers; and (3) other circuits' decisions evaluating belated attempts to revoke consent to magistrate-judge referrals. Dissent 21-27.

The case for en banc review is especially strong because of the chaos this rule will unleash. Under the majority's actual-knowledge standard, every losing litigant who has consented to a magistrate judge will have an incentive to comb through judges' personal lives, including their or their families' social media profiles, to try to identify interactions that would create a potential conflict. And it is "hard to imagine" when this ploy will come up short. Dissent 31. Even with a fulsome disclosure, a litigant will virtually always be able to find some detail about the "nature and extent" of a "potential conflict" that went undisclosed, then insist that it did not "actually know" that fact and that, if it had, it would not have consented. Op. 12. Indeed, as Judge Oldham explained, applying that standard here, *either* party could have overturned the magistrate judge's decision following a multi-week trial, whichever side lost. Dissent 31. The majority's standard creates the ultimate

trump card for disappointed litigants. Under it, no judgment entered by a magistrate judge or bankruptcy judge exercising consent jurisdiction will be secure.

As Judge Oldham and the amici former judges warned, the majority's rule invites an "onslaught of vacatur motions from disgruntled litigants." Amici Br. 5, ECF No. 78; *see* Dissent 27-31. The resulting chaos will seriously impair consent jurisdiction, if not grind it to a halt. And, as occurred in this case, magistrate judges themselves will be put on trial as losing attorneys pry into literally decades-old details about judges' personal and professional lives so parties can claim they did not actually know the full nature or extent of a potential conflict.

Rehearing should be granted.

## BACKGROUND

This appeal arises from the Port's efforts to invalidate a $120-million-plus judgment stemming from its obstruction of IFG's efforts to construct and operate an export grain terminal in the small city of Lake Charles, Louisiana. Dissent 14-16. IFG sued the Port for breaching its lease and violating the Louisiana Unfair Trade Practices Act. *Id.* at 15. From the outset, the Port's counsel knew that one of Magistrate Judge Kathleen Kay's law clerks, Margaret Monk, was the daughter of IFG counsel William Monk. *Id.*; *see* ROA.45172-73. Judge Kay disclosed Margaret's employment to the parties and explained that she would be screened from the case. Dissent 15-16. Still, the Port's general counsel, Michael Dees—who

himself knew Judge Kay going back years and often interacted with her on Facebook—wanted to proceed in front of her, and the parties consented to having Judge Kay decide the case. *See id.* at 15, 19; ROA.33955.

Trial counsel for both parties were veterans of Lake Charles's legal community and had known Judge Kay for years. *See* Dissent 15. When Rick Norman joined the Port's trial team, he and Dees discussed Norman's connections with Judge Kay. ROA.45226-27. Those connections included working at the same law firm and Norman twice chairing the panel that recommended Judge Kay's appointment as a magistrate judge. Dissent 15. Norman's son had also externed for Judge Kay. *Id.* The Port's counsel knew that Judge Kay and Monk had connections, too. Judge Kay and Monk asked about each other's children by name during status conferences; Norman and Monk walked into Judge Kay's daughter's wedding together; and Judge Kay gossiped with Norman at Monk's expense. *Id.* at 19; ROA.33425-27.

Following a twenty-day bench trial, Judge Kay issued a decision finding the Port liable. Dissent 16. The decision prompted Norman to ask whether there was a way to "tak[e] the case away from Judge Kay before she could award damages." *Id.* (alteration in original) (citation omitted). As Norman had said earlier, "[i]f Kathy screws us, we may want to take the gloves off and ask for a new trial." *Id.* (alteration in original) (citation omitted). After other Port attorneys discussed the decision with

their spouses, the spouses searched Facebook and promptly located photos of Monk serving as a (substitute) groomsman at Judge Kay's 1989 wedding, as well as a photo of Judge Kay officiating the 2015 wedding of one of Monk's daughters, Lucie. *Id.* at 17-18; *see* Op. 6. Still, Norman, who knew Judge Kay and Monk, concluded there were not "grounds for recusal." Dissent 17 (citation omitted).

But after the Port consulted new counsel—who was not from the Lake Charles legal community—it moved to vacate the referral to Judge Kay based on the Facebook photos of the two weddings. *Id.* at 17-18. In a sparse three-page affidavit, one of the Port's lawyers broadly asserted that the Port would not have consented to the magistrate-judge referral if "the complete nature of the relationship between the Monks and Magistrate Judge Kay [had] been disclosed." ROA.22918-20.

Chief Judge Terry Doughty denied the Port's motion, but this Court vacated that decision and remanded. *IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal Dist.*, 82 F.4th 402, 412-13, 421 (5th Cir. 2023). The Court directed the district court to determine the extent and nature of Judge Kay's relationship with Monk and his family, what Judge Kay disclosed to the parties, and the extent of the Port's "investigation." *See id.* at 421. Following a hearing, the district court vacated the referral and resulting judgment. Op. 3. The court held that only actual knowledge suffices for consent to a magistrate judge—rejecting both "circumstantial evidence" and "constructive knowledge" as a means of proving knowledge—and

concluded that the Port lacked such knowledge. Dissent 20-21. Among other things, the court dismissed as insufficient evidence demonstrating that Dees—the Port's own general counsel—had actually "liked" a Facebook post containing photos showing Monk in Judge Kay's 1989 wedding. *Id.* at 20.

A divided panel of this Court affirmed. The majority held that "to knowingly consent to a referral [under 28 U.S.C. § 636], a party must *actually* know the extent of a magistrate judge's conflicts." Op. 8-9. The majority rejected the constructive-knowledge standard this Court has applied in the context of judicial recusal, juror disqualification, and challenges to an arbitrator. *Id.* at 10-12. And, like the district court, the majority rejected overwhelming "circumstantial evidence of knowledge." Dissent 19-21. That was insufficient under its actual-knowledge standard.

Judge Oldham dissented. He explained that the majority's holding that "extraordinary circumstances" under Section 636(c)(4) requires actual knowledge of a potential conflict conflicts with Supreme Court, Fifth Circuit, and out-of-circuit precedent. Dissent 21-27. He further explained that the majority's rule would encourage losing litigants to make "last-minute, hail-Mary recusal motions," and put virtually "any magistrate or bankruptcy judge adjudication" at risk. *Id.* at 27-31.

## ARGUMENT

### I. THE MAJORITY'S DECISION CONFLICTS WITH DECISIONS OF THE SUPREME COURT, THIS COURT, AND OTHER CIRCUITS

The multifaceted conflict created by the majority's decision presents a textbook case for granting rehearing. Fed. R. App. P. 40(b)(2)(A)-(C).

First, the majority's decision conflicts with Supreme Court precedent. Section 636(c)(4) requires "extraordinary circumstances" to revoke consent to a magistrate-judge referral. The Supreme Court has long recognized that when "the basis for relief in [a] case is extraordinary," it is "[o]f particular importance" that a litigant did not display "neglect or lack of due diligence." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988). Just last year, the Court reaffirmed that when a standard demands "'extraordinary circumstances,'" a movant must be "faultless[]." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 212 (2025).

Remarkably, the majority did not cite, much less attempt to deal with, *BLOM Bank* or *Liljeberg*—on-point Supreme Court decisions holding that an "extraordinary circumstances" standard requires an inquiry into the movant's faultlessness. The majority's actual-knowledge standard cannot be reconciled with those cases. Under the majority's rule, a party "could exercise no diligence or care at all and *still* win." Dissent 24. For example, a "party could simply *do nothing*, sit on significant circumstantial evidence, or ignore attempts to provide direct

evidence." *Id.* Such a "no-care-at-all approach cannot fit the textual definition of extraordinary circumstances" as interpreted by the Supreme Court. *Id.*

Second, the majority's decision conflicts with this Court's precedents. *Id.* at 25-27. This Court has applied a constructive-knowledge standard to challenges to decisionmakers in analogous contexts. *Kerns v. First State Bank of Ben Wheeler (In re Kerns)*, 130 F.4th 455, 464 (5th Cir. 2025) (judicial recusal); *United States v. Wilson*, 116 F.3d 1066, 1086-87 (5th Cir. 1997) (juror disqualification), *vacated in unrelated part as recognized in United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998) (en banc); *Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320, 322 (5th Cir. 2019) (per curiam) (arbitrators). There is no basis for a different rule here.

The majority dismissed those analogous contexts as "concern[ing] forfeitures of a statutory right, not waivers of a constitutional right." Op. 10-12. But Congress supplied the standard for vacating a magistrate-judge referral—a litigant must show "extraordinary circumstances," and the Supreme Court has held that an "extraordinary circumstances" standard requires an inquiry into faultlessness. There is no basis for the Court to disregard Congress's "extraordinary circumstances" standard here: The majority did not hold it was somehow unconstitutional. And it would make no sense for the same words—"extraordinary circumstances"—to require a showing of due diligence in one context and not another.

In any event, the Port's attempt to revoke its consent lacks a constitutional dimension. The Port "explicitly conceded that its challenge 'is *not* based on any intentional acts of fraud, bias, or undue influence'" by Judge Kay. Dissent 29-30 (emphasis added) (quoting ROA.22916). As Judge Oldham recognized, that means this case—like "most matters relating to judicial disqualification"—does "not rise to a constitutional level." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (citation omitted); *see* Dissent 29-30.

And the majority's underlying premise was wrong, too: Constitutional rights *can* be waived without actual knowledge. For example, if a party "fails" to request a jury trial, "even accidentally, then the party forfeits the right to have his case heard by a jury." *Pizza Hut L.L.C. v. Pandya*, 79 F.4th 535, 541 (5th Cir. 2023). "That a contractual jury waiver involves a constitutional right does not change the analysis" of a party's waiver based on conduct. *Id.* Likewise, this Court has considered a party's due diligence in analyzing a challenge to an arbitration agreement, *Bowles v. OneMain Fin. Grp., L.L.C.*, 954 F.3d 722, 726 (5th Cir. 2020), even though such agreements can waive a constitutional jury-trial right, *see American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 711 (5th Cir. 2002). Under the majority's actual-knowledge standard, however, parties could avoid their agreements to arbitrate by claiming that they never read the agreements they subsequently signed.

Third, the majority's decision conflicts with decisions of other circuits. In *United States v. Dobey*, the Tenth Circuit held that defendants had "knowingly waived their right to trial before the district court" despite their claim "that neither they nor their trial counsel were aware that magistrates lacked the attributes of Article III judges." 751 F.2d 1140, 1142-43 (10th Cir. 1985). And in *Norris v. Schotten*, the Sixth Circuit inferred from a *pro se* habeas petitioner's "prior experience" with the habeas process that he was "fully aware that he had … a right" to an Article III decisionmaker. 146 F.3d 314, 326 (6th Cir. 1998).

As Judge Oldham explained, the results in those cases—arising in "the[] same legal areas" this Court looked to in *Carter v. Sea Land Services, Inc.*, 816 F.2d 1018, 1021 (5th Cir. 1987)—conflict with the majority's decision. *See* Dissent 25-26. Yet, as with the Supreme Court precedent holding that an "extraordinary circumstances" test requires an inquiry into faultlessness, *see supra* at 7, the majority did not even acknowledge those closely analogous decisions.

The majority's threadbare analysis does not remotely justify its extraordinary and "brand-new" rule for revoking consent. Dissent 30. Rehearing is warranted to negate the multifaceted conflict that decision creates.

## II. IF ALLOWED TO STAND, THE MAJORITY'S DECISION WILL WREAK HAVOC ON THE ADMINISTRATION OF CONSENT JURISDICTION AND THE JUDGES WHO EXERCISE IT

An actual-knowledge standard eviscerates the "extraordinary circumstances" requirement by affording relief to litigants, like the Port here, who do not act with reasonable care, ignore facts in plain sight, or, worse, engage in gamesmanship. A party who cannot show that it exercised due diligence is not entitled to the extraordinary remedy of vacating a referral after an adverse judgment. A constructive-knowledge standard refuses to reward parties who fail to inquire about potential conflicts, are "plainly incompetent" in failing to uncover available information, or "malicious[ly]" seek to game the system. Dissent 24.

This case puts the perverse incentives the majority's rule creates on full display. As Judge Oldham explained, there was significant "circumstantial evidence" of the Port's knowledge of the Kay-Monk relationship. Dissent 19-21 (discussing evidence). But under the majority's standard, the Port was permitted to avoid a $120-million-plus judgment by disavowing knowledge of a relationship that (at least) was staring its in-house and outside counsel in the face.

Rewarding litigants who fail to exercise reasonable diligence—or worse, try to game the system—is bad enough. But the majority's decision threatens consent jurisdiction altogether. As Judge Oldham explained, the majority's actual-

knowledge standard "jeopardizes virtually all magistrate and bankruptcy judge orders." *Id.* at 14, 28-29; *see also* Amici Br. 16-19.

The majority's rule will wreak havoc on a number of fronts. First, it is entirely unclear how anyone could "ever satisfy this brand-new actual knowledge standard." Dissent 30-31. Under the majority's rule, a losing litigant's claim that it was unaware of any detail that allegedly would have affected its consent places an impossible burden on the non-movant to prove that the losing party had actual knowledge of that fact. This case illustrates the impossibility of meeting that burden. The Port denied knowledge that Judge Kay and Monk's social connections extended beyond the fact that Monk's daughter was clerking for Judge Kay. Yet there was overwhelming evidence that the Port knew or should have known the clerkship was not the full extent of Judge Kay and Monk's connections. For example, evidence showed that the Port's general counsel "liked" a Facebook post containing photos of Monk at Judge Kay's wedding; Judge Kay and Monk referred to each other's children by their first names during status conferences; and Monk and Port counsel Norman actually walked into Judge Kay's daughter's wedding together. *See* Dissent 19-20; ROA.33425-27. If this evidence is not enough to overcome a losing litigant's bare denial of knowledge, it is hard to see what would be.

Second, the majority's rule creates an incentive for any losing party to seek vacatur of a referral as soon as a judge issues her decision. Whichever party loses,

it will have "obvious, perverse incentives" to do the type of "'investigation' of jurists that occurred here" to find some undisclosed, decades-old event that "could result in overturned judicial proceedings." Dissent 28. Anyone can easily say they would not have consented if they had known of some undisclosed event, interaction, or detail—even one decades old, as here. And the filing of a bare-bones affidavit alleging such an event or detail will then subject a judge to extensive discovery into all aspects of his or her personal and professional life, and could literally subject the judge to cross-examination—as happened to Judge Kay here. "[S]uch gamesmanship could be the rule in future cases, not the exception." *Id.* at 29.

This case again highlights the untenability of the rule. In a world where the Port had prevailed at trial, the parties' roles in this case could just as easily have been reversed. "If the Monk-Kay relationship was improper, so was the Norman-Kay relationship" and "the Dees-Kay relationship." *Id.* at 22. So, if IFG had lost at trial, IFG would have been equally entitled to vacatur because it did not "actually know" every last detail about the "nature and extent" of the Port's counsel's connections with Judge Kay. Op. 12; *see* Dissent 31. This "absurd result" underscores that the majority's decision should not be circuit precedent. Dissent 22.

Third, the majority's rule will put nightmarish demands on magistrate judges. Under the majority's rule, a magistrate judge "would have to disclose any and all social relationships dating back decades"—or else "humdrum connections could

void years of hard-fought, expensive, and honest litigation." Dissent 28. Magistrate judges, like Article III judges, are members of their communities and invariably have numerous professional and personal connections to litigants and attorneys and their spouses or children. Amici Br. 17. An actual-knowledge standard turns these "commonplace relationships between bench and bar" into traps for the unwary and tools for unscrupulous litigants to avoid judgments. Dissent 21. And the problems are multiplied by the fact that the majority's rule is triggered by relationships with a judge's family members, too. Here, for example, the reason Monk was a substitute groomsman in Judge Kay's wedding decades ago was that he was friends with *Judge Kay's husband*. *See* IFG Opening Br. 15, ECF No. 73.

Nor will the damage to the system be limited to magistrate judges. As Judge Oldham noted, bankruptcy judges too may rely on litigant consent to draw authority for their judgments. Dissent 28 (citing 28 U.S.C. § 157(c)(2)). So bankruptcy courts' decisions are likewise at risk under the majority's decision. Indeed, bankruptcy commentary has already connected the dots. *See* Bill Rochelle, *Fifth Circuit Announces Rule for Broad Disclosure of Bankruptcy Judges' Relationships*, Am. Bankr. Inst. (Sept. 17, 2026), https://www.abi.org/newsroom/daily-wire/fifth-circuit-announces-rule-for-broad-disclosure-of-bankruptcy-judges (majority decision "announce[s] a rule where bankruptcy judges must disclose personal and professional relationships going back decades, to avoid recusal or having decisions

vacated"). The prospect of post-hoc gamesmanship will complicate an already overly burdened and contentious bankruptcy adjudication process. As Judge Oldham observed, "[i]t is hard to imagine how any magistrate or bankruptcy judge adjudication could survive the standard set out in [this] opinion." Dissent 31.

Losing litigants will surely try to prove Judge Oldham right. After all, if the Port's Hail Mary succeeds, any attorney who loses a significant judgment in front of a magistrate judge would almost *have* to pursue the same strategy, for example by searching LinkedIn, Facebook, or other sites, lest they be accused of not zealously representing their clients. The majority's approach threatens to make consent-revocation proceedings—and the kind of invasive discovery that ensued below—a coda in every consent-jurisdiction case.

Finally, one has to wonder if some who would otherwise apply for magistrate or bankruptcy judgeships will conclude that the game is not worth the candle. *See* Amici Br. 18. The more connected, the greater the burden. And who wants to spend weeks trying a case before parties who have consented to jurisdiction, when the losing party may always claim some detail was not disclosed, seek vacatur of a referral and years of hard work, and then put *the judge* on trial? It is no exaggeration to say that the modern judicial system could not function without the work of magistrate judges and bankruptcy judges. The majority's rule will greatly disrupt consent jurisdiction and besiege judges.

Rehearing is warranted before this chaos is unleashed.

## CONCLUSION

Rehearing en banc should be granted.

Dated: October 13, 2026

Respectfully submitted,


/s/ Gregory G. Garre
Gregory G. Garre
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Thomas M. Flanagan
FLANAGAN PARTNERS LLP
201 St. Charles Ave., Suite 3300
New Orleans, LA 70170
(504) 569-0235
tflanagan@flanaganpartners.com

Samir Deger-Sen
Peter Trombly
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-4619
samir.deger-sen@lw.com
peter.trombly@lw.com
kristin.holladay@lw.com

*Counsel for Plaintiff-Appellant IFG Port Holdings LLC*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 40(d)(3)(A) and Fifth Circuit Rule 40.2.5 because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, it contains 3,884 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: October 13, 2026

*/s/ Gregory G. Garre*
Gregory G. Garre

# ADDENDUM
# PURSUANT TO FIFTH CIRCUIT RULE 40.2.2.10

# United States Court of Appeals
# for the Fifth Circuit

No. 24-30552

United States Court of Appeals
Fifth Circuit
**FILED**
September 8, 2026
Lyle W. Cayce
Clerk

IFG Port Holdings, L.L.C.,

*Pl.......ff—Appellant*,

*versus*

Lake Charles Harbor & Terminal District, *doing business as* Port of Lake Charles,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:16-CV-146

Before Stewart, Graves, and Oldham, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*:

After presiding over a bench trial by consent, U.S. Magistrate Judge Kathleen Kay awarded IFG Port Holdings almost $125 million. The losing side, the Lake Charles Harbor and Terminal District (the Port), later discovered that Judge Kay and IFG's lead trial counsel had been close family friends for nearly forty years. All Judge Kay had disclosed about the friendship was that IFG's lead counsel's daughter was her law clerk, who would be screened from the case. At best, this disclosure was incomplete.

The Port seeks to vacate the magistrate judge referral. Yet IFG claims that the Port's post-consent constructive knowledge of the friendship can sustain the referral. It cannot.

To waive Article III jurisdiction, a party must knowingly, voluntarily, and intelligently consent. We construe this standard consistently with other waivers of fundamental rights, such as pleading guilty or waiving a jury trial. A party must fully understand what the waiver connotes and its consequence. And we must indulge every reasonable presumption against waiver. Because a constructive knowledge standard would presume a waiver without full understanding, we reject it.

Hence the district court applied the right standard: For the Port's consent to be knowing, it must have actually known the nature and extent of Judge Kay's conflict before judgment. We AFFIRM.

## I. Background

This dispute concerns permits to dredge a ship channel in Lake Charles, Louisiana. *IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal Dist.* (*First Panel Op.*), 82 F.4th 402, 405–06 (5th Cir. 2023). IFG hoped to use the channel to develop a grain terminal. *Id.* So it leased the channel from the Port in 2011. *Id.* at 406. The lease never specified who would secure a permit for the necessary dredging. *Id.*

By 2015, the terminal was complete, but the dredging was not. *Id.* Without the dredging, IFG could not fully use the terminal. *Id.* In IFG's view, it was excused from performing under the lease because the Port was responsible for securing the permits. *Id.* The Port demanded that IFG perform, reasoning that the permits were IFG's responsibility. *Id.*

IFG responded by suing in the Western District of Louisiana. *Id.* District Judge Patricia Minaldi took the case. In February 2017, the parties consented to a bench trial before Judge Kay. After a twenty-day trial, the Port

lost, and Judge Kay awarded IFG nearly $125 million. The posttrial order was unusually harsh, aiming personal attacks at the Port and its lawyers.[1]

After the posttrial order, the Port investigated Judge Kay and discovered her mostly undisclosed friendship with IFG's lead counsel: William Monk. *See IFG Port Holdings LLC v. Lake Charles Harbor & Terminal Dist.* (*Ord. Vacating Referral*), 742 F. Supp. 3d 548, 562–65 (W.D. La. 2024), *reconsideration denied*, 2025 WL 1255155 (W.D. La. Feb. 6, 2025). When the Port moved to vacate Judge Kay's referral, the district court denied the motion. *See id.*

The Port appealed. *First Panel Op.*, 82 F.4th at 408. A previous panel held that the Port's allegations about Judge Kay's failure to fully disclose her relationship with Monk might be grounds to vacate the referral. *Id.* at 414–17. But the panel remanded for further factual development. *Id.* at 417, 442–43. On remand, the district court held a three-day evidentiary hearing, found that the Port's consent was not knowing, and vacated the referral. *Ord. Vacating Referral*, 742 F. Supp. 3d at 551–87.

## II. Discussion

IFG appeals the district court orders vacating Judge Kay's referral. Finding no abuse of discretion, we affirm.

### A. We review a motion to vacate a referral for abuse of discretion.

[1] For example, Judge Kay called the Port's behavior "extortionary," "sanctimonious," "nefarious," and other like descriptors. She also accused the Port's lawyers of acting with a "hubris" that was "stunning," and "flagrant[ly] violat[ing] . . . court rules and procedures."

When the parties consent, a magistrate judge may conduct proceedings and enter judgment in a civil lawsuit. 28 U.S.C. § 636(c)(1). Still, a district court may vacate the referral if the party shows extraordinary circumstances. *Id.* § 636(c)(4); FED. R. CIV. P. 73(b)(3). Whether there are extraordinary circumstances depends on the eight *Carter* factors. *See Carter v. Sea Land Servs., Inc.*, 816 F.2d 1018, 1021 (5th Cir. 1987).[2] Only one is relevant here: "whether consent was voluntary and uncoerced." *See First Panel Op.*¸ 82 F.4th at 415–17.

We review the denial of a motion to vacate a magistrate judge referral for abuse of discretion. *Id.* at 414. A court abuses its discretion when it bases its decision "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002) (citation modified).

**B. Judge Kay and Monk had an undisclosed close family friendship, which the Port discovered after judgment.**

We resolve IFG's factual challenges first. In the previous appeal, we charged the district court to resolve three essential issues: (1) How close was the Monk-Kay relationship? *First Panel Op.*, 82 F.4th at 416–17. (2) What did Judge Kay disclose about it? *See id.* And (3) when did the Port discover the relationship's nature and extent? *See id.*

The district court met its charge. In a fifty-nine-page order, it found that: Judge Kay, Monk, and their families shared "a close, multifaceted, and personal friendship spanning nearly forty years." *Ord. Vacating Referral*, 742

[2] They are: (1) undue delay, (2) inconvenience to the court and witnesses, (3) prejudice to the parties, (4) whether the movant is represented, (5) whether consent was voluntary and uncoerced, (6) whether the motion is made in good faith, (7) the possibility of the magistrate's bias or prejudice, and (8) whether holding the party to their consent would serve the interests of justice. *Carter*, 816 F.2d at 1021.

F. Supp. 3d at 578. Yet Judge Kay disclosed only that she employed Monk's daughter as a law clerk. *Id.* at 579.The Port discovered the friendship years later, after Judge Kay's post-trial order. *Id*. IFG challenges these findings, but we find no clear error.

***1. The Monk-Kay friendship was close, personal and spanned nearly forty years.***

Judge Kay is a Lake Charles native. *Id.* at 568. After leaving for law school, she returned for a federal clerkship and soon began dating her future husband, Scott. *Id.* He introduced her to Monk in 1985, and Judge Kay quickly learned that she and Monk's wife (Aimee) were childhood acquaintances. *Id.* Over the next few years, the couples' relationship deepened. While Judge Kay clerked, they would sometimes gather with other young couples for social events, such as game nights or meals out. *Id.* at 569. In 1989, Judge Kay and Scott married and Monk was a groomsman. *Id.*

The couples stayed close. *Id.* at 569–72. Judge Kay and Scott joined the Monks for periodic happy hours. *Id.* at 569. Scott played golf with Monk, and sometimes offered him concert tickets. *Id.* The couples also got to know each other's parents. *Id.* They always attended the same annual Christmas Eve party. *Id.* When children came, the families grew even closer. Their sons were in the same grade and became close friends *Id.* at 569–70. Judge Kay and Aimee once drove the boys to camp. *Id.* at 570. And in 2010, the Monks took Judge Kay's son on a family vacation. *Id.*

The Monk-Kay friendship remained strong into the 2010s—even after the Port consented to the referral. *Id.* at 570–72. The families often had dinners together. *Id.* at 571–72. Judge Kay and Monk also frequently exchanged texts and Facebook messages. *Id.* at 570. They wished one another happy birthday, discussed concerts, and shared updates about their children and grandchildren. *Id.* Some of these messages "indicate[] a familiarity and

lack of formality more at home in a personal friendship than in a professional relationship." *Id.* For example, Monk texted Judge Kay in late-2017 to "describe[] a music festival lineup as 'aimed more for post-summer, pre-fall relaxation than drunken debauchery.'" *Id.* Judge Kay replied, "What's wrong with drunken debauchery??" *Id.*

In the 2010s, Judge Kay and the Monks shared major life events. *Id.* at 570–72. In 2014, Judge Kay and Scott threw a party celebrating several family accomplishments, and Monk joined. *Id.* at 571. In 2015, Judge Kay officiated Monk's daughter Lucie's wedding. *Id.* Lucie later threw Judge Kay a surprise birthday party. *Id.* When Judge Kay's daughter married in 2017, Monk went. *Id.* At this wedding, Scott's band played, and Monk introduced it—Judge Kay drafted these remarks. *Id.*

IFG seeks to minimize this relationship. It relies on Judge Kay and Monk's attempts to distance themselves at the hearing. *See id.* at 572. But the district court did not find this credible, and we owe this finding "great[] deference." *Id.*; *see Kenai Ironclad Corp. v. CP Marine Servs., LLC*, 84 F.4th 600, 605 (5th Cir. 2023) (citation modified). Besides, Judge Kay's actions over the last forty years belie any claim she and Monk were not close. *See Ord. Vacating Referral*, 742 F. Supp. 3d at 569–72.

***2. Before the Port consented, Judge Kay disclosed only that Monk's daughter was her law clerk.***

Despite all of this contact, Judge Kay's disclosure was minimal. At a 2016 status conference, she disclosed only that Monk's other daughter, Margaret, was her law clerk and would be screened from the case. *Id.* at 553. Judge Kay disclosed nothing more about her friendship with Monk at the conference—or ever. *Id.* Relying on this incomplete disclosure, the Port consented to the referral in January 2017.

***3. The Port discovered the friendship's extent after judgment.***

The Port discovered the extent of the friendship only after judgment. After the ruling, the Port investigated Judge Kay. *Ord. Vacating Referral*, 742 F. Supp. 3d at 562–65. Through Judge Kay's Facebook page, the Port attorneys discovered photos of Monk at Judge Kay's wedding, and Judge Kay officiating Lucie Monk's wedding. *Id.* at 564. These photos formed the basis of the Port's initial motion to vacate. *Id.* at 568.

IFG claims that the Port's lawyers knew the extent of the Monk-Kay friendship earlier. But there is no compelling evidence that they did. Judge Kay had cordial, professional relationships with the Port's lawyers, such as Rick Norman and Michael Dees, and the lawyers sporadically interacted with Judge Kay's Facebook. *Id.* at 572–78. These contacts are not conclusive that the Port lawyers learned the extent of the Monk-Kay friendship. *See id.* The district court found that this evidence was simply insufficient to show the Port lawyers' actual knowledge of the friendship before judgment. In this, we find no clear error.

**C. Because the district court also applied the right standard, we affirm.**

So, we reject IFG's factual challenges. Judge Kay's disclosure was incomplete, at best, and perhaps misleading. The partial disclosure implied that Monk's daughter's clerkship was the extent of their ties, when the friendship was far closer. Relying on this, the district court found that the Port "lacked crucial information" about the Monk-Kay relationship, so its consent was "not knowing[] and intelligent[]." *Ord. Vacating Referral*, 742 F. Supp. 3d at 585.

IFG responds that the Port's knowledge of the relationship before judgment forecloses its attempt to vacate the referral. As the previous panel explained, "consent to a magistrate-judge referral can be inferred from a party's conduct during litigation." *First Panel Op.*, 82 F.4th at 417 (quoting *Roell v. Withrow*, 538 U.S. 580, 582 (2003)). So "if the Port learned of the

intimacy of the friendship before . . . judgment and chose to remain silent, then its consent would remain valid." *Id.*

We have already rejected IFG's argument that the Port, in fact, knew the extent of the Monk-Kay friendship before judgment. But IFG urged the district court, and now us, to adopt a constructive knowledge standard. *Ord. Vacating Referral*, 742 F. Supp. 3d at 583. Under it, the Port lawyers' constructive knowledge of the Monk-Kay friendship could imply their ongoing consent to the referral. The district court rejected this standard, and so do we.

***1. Constructive knowledge cannot waive a fundamental constitutional right.***

Consent to magistrate judge jurisdiction waives the right to Article III adjudication, so consent is "a constitutional imperative." *See First Panel Op.*, 82 F.4th at 415. The standard to waive this right matches "the standard for . . . other waivers of rights." *Carter*, 816 F.2d at 1021. *Carter* drew the consent factor from the guilty-plea context. *See id.* (citing *United States v. Carr*, 740 F.2d 339 (5th Cir. 1984)). Like a guilty plea, consent to a referral must be knowing, intelligent, and voluntary. *First Panel Op.*, 82 F.4th at 416; *see Grabowski v. Jackson Cnty. Pub. Defs. Off.*, 47 F.3d 1386, 1389 (5th Cir. 1995).

Constructive knowledge does not suffice in the guilty plea context, and it does not here. To plead guilty, a defendant must fully understand "what the [waiver] connotes and . . . its consequence." *United States v. Hernandez*, 234 F.3d 252, 254–55 (5th Cir. 2000). Hence a district court must "inform the defendant accurately of the proper minimum sentence that will result from the plea." *United States v. Carreon-Ibarra*, 673 F.3d 358, 364 (5th Cir. 2012) (citation modified). This ensures that the defendant understands the plea's "direct consequences." *See id.* Analogously, to knowingly consent

to a referral, a party must *actually* know the extent of a magistrate judge's conflicts. Otherwise, they cannot fully understand the waiver's consequence.

*Carter* also drew from the jury-trial waiver context. *See Carter*, 816 F.2d at 1021 (citing *Cox v. C.H. Masland & Sons, Inc.*, 607 F.2d 138 (5th Cir. 1979)). Waiver of the right to a civil jury trial "may also be inferred from a party's conduct." *McDonald v. Steward*, 132 F.3d 225, 229 (5th Cir. 1998) (citation modified). Yet "any seeming curtailment of the right . . . should be scrutinized with the utmost care." *Id.* "Courts should indulge every reasonable presumption against waiver." *McAfee v. Martin*, 63 F.3d 436, 437 (5th Cir. 1995). So waiver "should not be found in a 'doubtful situation.'" *Id.* (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)). A constructive knowledge standard inverts this principle: it presumes waiver in a doubtful situation.

By illustration, we have declined to infer consent to waive a jury trial when a plaintiff had constructive knowledge that he was participating in a bench trial. *See McAfee*, 63 F.3d at 437–38. In *McAfee*, a magistrate judge found that an unrepresented plaintiff had failed to carry his ultimate burden of proof after "an evidentiary hearing" that was effectively a bench trial. *Id.* The judge "did not use the term *trial* until well into the proceeding and then without explaining the difference between a trial and an evidentiary hearing." *Id.* (citation modified and italics added). Surely, the plaintiff constructively knew the difference between a trial and a hearing, and that he was participating in a bench trial. Yet our court declined to imply a waiver through his conduct in this "doubtful" situation. *Id.*

This case presents another doubtful situation. IFG claims that certain contacts between Judge Kay and the Port's lawyers—while not sufficient to show actual knowledge of the Monk-Kay friendship—were sufficient to trigger a duty to investigate the relationship, thereby implying their client's

consent to the referral. This presumes that the Port's inaction waived its consent, and illustrates precisely the problem with a constructive knowledge standard: It presumes a waiver of a fundamental right. For this reason too, we reject it.

What is more, "litigants and counsel should be able to rely upon judges to comply with their own Canons of Ethics." *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 742 (6th Cir. 1999) (quoting *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995)). It was Judge Kay's duty to inform the Port "about a friendship with a lawyer . . . that [she] believe[d] the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification." *First Panel Op.*, 82 F.4th at 418 n.9 (quoting ABA Standing Comm. on Ethics & Pro. Resp., Formal Op. 488, *Judges' Social or Close Personal Relationships with Lawyers or Parties as Grounds for Disqualification or Disclosure* (2019)). She failed to do so. Without good reason, we will not adopt a standard that requires a party to "pore through [a] judge's private affairs," to prevent a waiver of a constitutional right. *Am. Textile Mfs.*, 190 F.3d at 742.

***2. We reject IFG's analogies to contexts that allow inadvertent forfeiture of statutory rights.***

IFG attempts to analogize superficially similar contexts that use a constructive knowledge standard. But the analogies fail because the contexts concern forfeitures of a statutory right, not waivers of a constitutional right.

Take judicial recusal, for example. IFG relies on *In re Kerns*, where a litigant argued that a bankruptcy judge should have recused because "he served as [a] lawyer in the matter" in "private practice." *Kerns v. First State Bank of Ben Wheeler* (*In re Kerns*), 130 F.4th 455, 463 (5th Cir. 2025) (quoting 28 U.S.C. § 455(b)(2)). Kerns had constructive knowledge that the judge served as a lawyer in the matter previously. *Id.* at 463–64. Because Kerns

should have known about the statutory recusal ground and failed to raise it, he forfeited it. *Id.*

Of course, recusal has a constitutional dimension: The Due Process Clause guarantees an impartial judge. *See, e.g.*, *Republican Party of Minn. v. White*, 536 U.S. 765, 775–76 (2002). But "not all questions of judicial qualification involve constitutional validity." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986) (citation modified). "[M]atters of kinship, personal bias . . . [and] remoteness of interest [are] generally" left to "legislative discretion." *Id.*

Thus, even if a judge is disqualified under federal law, the Constitution might not mandate recusal.[3] *See id.* at 821. Kerns claimed a statutory—not a constitutional—right to recusal, so his protection was diminished. *See In re Kerns*, 130 F.4th at 463–64. The Port's right to consent to a referral is constitutional. *See Carter*, 816 F.2d at 1021. Naturally, this right enjoys greater protection.

Juror disqualification and arbitration make worse analogies. Whether trial counsel had a duty to investigate with "reasonable diligence" a juror's potential bias during voir dire has little relevance to a duty to investigate a magistrate judge's potential bias after consent. *Cf. United States v. Wilson*, 116 F.3d 1066, 1086 (5th Cir. 1997), *vacated in part on other grounds sub nom. United States v. Brown*, 161 F.3d 256 (5th Cir. 1998). Nor are the *statutory* grounds to vacate an arbitration award analogous to the *constitutional* right to

---

[3] Indeed, the *First Panel Opinion* observed this distinction: "Put differently, even if a given friendship would not warrant recusal under § 455, it does not follow that *nondisclosure* of that friendship is constitutionally permissible." 82 F4th at 418 (citing 28 U.S.C. § 455).

Article III adjudication. *Cf. Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320, 322–23 (5th Cir. 2019).

Besides, *Carter* provides clear guidance on analogous contexts. They must involve a waiver of another fundamental right. *See Carter*, 816 F.2d at 1021. It gave examples: guilty pleas, jury-trial waivers, and the right to be represented by counsel of choice. *See id.* (citation modified). We should be wary of drawing parallels other contexts, and do so only when they concern an analogous fundamental right.

Thus, we reject IFG's constructive knowledge standard. For consent to be knowing, a party must actually know the nature and extent of a magistrate judge's potential conflict. Because the district court applied this standard, we see no error. *See First Panel Op.*, 742 F. Supp. 3d at 572–79; *IFG Port Holdings LLC v. Lake Charles Harbor & Terminal Dist.* (*Reconsideration Ord.*), No. 2:16-CV-00146, 2025 WL 1255155, at *12–14 (W.D. La. Feb. 6, 2025).[4]

* * *

Overwhelming evidence shows a close family friendship between Judge Kay and Monk. And vanishingly little direct or circumstantial evidence suggests the Port actually knew about the friendship before judgment. The district court applied the right knowledge standard to these facts: Only the Port's actual knowledge of the nature and extent of the Monk-Kay friendship before judgment is sufficient to show their knowing consent.

---

[4] Nor are we persuaded that the district court improperly required direct evidence. Instead, it considered circumstantial evidence together with the lack of direct evidence when rejecting IFG's arguments. *See Ord. Vacating Referral*, 742 F. Supp. 3d at 572–79; *Reconsideration Ord.*, 2025 WL 1255155, at *12–14. The lack of direct evidence was relevant, but not dispositive. *See id.*

While vacation of a referral is an extraordinary remedy, this case warrants it. Judge Kay's actions raise serious concerns about the fairness of her proceedings. Her unusually harsh order, coupled with the windfall verdict, exacerbates this impression. We AFFIRM.

Andrew S. Oldham, *Circuit Judge*, dissenting:

The Lake Charles Port lost a trial worth more than $120 million. The Port's lawyers were understandably upset. What's less understandable is what they chose to do about it.

The Port's lawyers attempted to vacate the judgment based on the fact that opposing counsel's daughter clerked for the magistrate judge who tried the case. Everyone—including the Port's lawyers—knew this fact before trial. The law clerk was recused from the matter. And the Port consented to the magistrate judge trying the case anyway.

Still, the point of the Hail Mary pass is that it sometimes works. And for the Port, that sometime is today.

I respectfully dissent. The majority's legal rule conflicts with the statutory text and Supreme Court precedent. It also contradicts circuit authority, encourages parties to scrutinize judges' private affairs, and jeopardizes virtually all magistrate and bankruptcy judge orders.

I

This story has three parts. First, a contractual dispute. Second, a trial. Third, a years-long—and now successful—scheme by the loser of that trial to undo a large, adverse judgment by Facebook-stalking a jurist.

A

Between Beaumont and Lafayette lies a port formally known as the Lake Charles Harbor & Terminal District ("the Port"). *IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal Dist. (IFG I)*, 82 F.4th 402, 405–06 (5th Cir. 2023). This case began when a port tenant, IFG Port Holdings LLC ("IFG"), and the Port began talks about a new project. In brief, IFG wanted to build an export grain terminal. *Ibid*. This project would require IFG to build a new facility on a relevant berth and the Port to dredge the

waterway so that it was deep enough for the ships that would load and unload their cargo at the new facility. The Port, for its part, "agree[d] to take reasonable steps to work with" the U.S. Army Corps of Engineers to deepen the waterway approaching the relevant berth. ROA.34345. And IFG agreed to construct the grain-export facility. ROA.21709–17. IFG held up its end of the bargain. ROA.21723.

But the Port did not get the permits from the U.S. Army Corps of Engineers that were necessary to begin dredging. No dredging occurred by the time that the facility finished construction in 2015, so it was unusable. ROA.21723, 21749, 21756. After much back and forth, IFG sought relief in federal court. It alleged that the Port had breached the relevant contract and violated the Louisiana Unfair Trade Practices Act. ROA.118–50.

B

IFG retained William Monk to represent it. The Port retained William J. "Joe" Mize and Matt Mize, along with Merrick "Rick" Norman. ROA.28850; ROA.28853–54.

The case was originally placed on the docket of United States District Judge Patricia Minaldi and Magistrate Judge Kathleen Kay. ROA.28850. The parties consented to have Magistrate Judge Kay try the case. ROA.28847, 28852.

The attorneys and Judge Kay were all familiar. Norman's son had done an externship in Judge Kay's chambers. ROA.28883. Norman had chaired the panel that recommended Judge Kay's appointment (and her reappointment). ROA.28854. He "practiced law with her in the same firm for a while." *Ibid.* And Monk's daughter Margaret Ellen was clerking for Judge Kay—a fact that both Joe and Matt Mize knew. ROA.45172–73. Judge Kay also informed the parties of that fact and said she would screen Margaret

from the case. ROA.28851. It is thus undisputed that the Port's lawyers had detailed knowledge about Judge Kay and this potential conflict.

Judge Kay then held a twenty-day bench trial. *IFG I*, 82 F.4th at 406. During the trial, the Port's counsel were concerned about an adverse outcome. They were so concerned, in fact, that their lawyers exchanged a series of increasingly desperate emails. Norman emailed, "[w]e don't know the result yet but all signs point to a disaster." ROA.28858. Joe Mize also got in on the action, writing about Judge Kay that "[t]his woman is insane." ROA.28859. Norman wrote that "[i]f Kathy screws us, we may want to take the gloves off and ask for a new trial." ROA.28858. Matt Mize then asked if they could get a new trial, and "if we moved for and we're granted a motion for new trial could we revoke consent to have Kay try to [*sic*] the case??" ROA.28859.

The Port lost. Judge Kay issued a lengthy opinion finding that the Port was liable. ROA.21702–65. And Judge Kay determined that IFG was entitled to treble damages, resulting in a damage award of $124,531,652. *IFG I*, 82 F.4th at 407.

C

The Port's lawyers were upset. Norman compared the ruling to "losing the Super Bowl by eight touchdowns." ROA.28862. Matt Mize texted his wife that it was "the worst case scenario." ROA.28861.

Norman, "grasping at straws," emailed Matt Mize about filing a motion to recuse based on Margaret's work as a clerk. ROA.28863. The idea was to "tak[e] the case away from Judge Kay before she could award damages." *Ibid.* At this point, Norman also reached out to a local attorney, Mike Vernon, for advice about how this scheme would work. ROA.45286. Norman asked whether Margaret Monk's employment would "help us at the 5th Circuit." *Ibid.* Vernon said that "if the port's lawyers consented to trial

before Kathy knowing that Bill's daughter worked for her, they are going to have a problem complaining about it down the line." *Ibid.* But Vernon advised, "[s]till, I would mention it quite a bit. The feds don't like that kind of stink." ROA.45286. The upshot was clear: the alleged conflict was legally irrelevant, but the Port's lawyers thought it might "help [them] at the 5th Circuit" anyway. *Ibid*.

Joe and Matt Mize tried the same strategy—employing their wives, Maura and Leslie. Maura searched Judge Kay's public Facebook page and came across a photo of Judge Kay's wedding in 1989. ROA.28691; ROA.28864–65. Monk was in some of those photos. ROA.28864–65. Leslie found similar photos showing Monk in what she thought was groomsman's attire, and she also saw a photo of Judge Kay officiating the wedding of Monk's other daughter. ROA.28866–67.

But this was all small potatoes. Norman himself said in response to the photos, "I've read some law review articles. I don't see grounds for recusal." ROA.28865. So Norman turned to his wife Polly. Polly was no help, saying that "there is no close friendship" between Monk and Judge Kay. ROA.28865; ROA.45273. Recognizing this weakness, the dominant theme among the Port's legal team was that the grounds for appeal would be a "bias issue based on Judge Kay's tone in the ruling"—not any alleged conflict. ROA.28866.

That was not good enough for the Port. So the Port retained yet another lawyer, Michael McKay. McKay picked up where Norman and the Mizes had left off. He informed the "Port Board that he and his team were looking into the relationship between Judge Kay and Monk." ROA.28869.

Then he *also* struggled to find anything material. With no firsthand witnesses to the relationship between Monk and Judge Kay, McKay did not have a single person who was willing to sign an affidavit about the putative

misconduct based on that supposed relationship. ROA.28873. Struggling, McKay's team had Matt Mize sign an affidavit based on "[s]creenshots of the Facebook content located by Maura Mize and Leslie Mize." *Ibid.* This material was undeniably skimpy, and the Port knew it. So their motion to vacate hinged on a single question: was it enough "stink" for the "feds" to take issue with the judgment? ROA.45286.

The answer was no, at least initially. Chief Judge Terry Doughty denied the Port's motion, noting that "some prior social and/or professional interactions" were coin-of-the-realm in "relatively small legal communities" like Lake Charles, Louisiana. ROA.23153. When the Port appealed, this court reversed. Our court explained that the Port's allegations "remain[ed] untested," and we directed the district court to determine the extent of the relationship between Judge Kay and Monk. *IFG I*, 82 F.4th at 412, 417–21.

On remand, the district court set out a new legal standard for what the parties had to show. The court stated that "only actual knowledge of a relationship suffices for knowing and voluntary consent to a magistrate judge." ROA.28897. That standard meant that IFG had to show the Port had actually known about the alleged conflict of interest. What's more, the court also demanded "direct evidence" of actual knowledge of the potential conflict—apparently setting aside any circumstantial evidence or inference in proving knowledge. ROA.29115.

The court also directed discovery. The short summary of that discovery is that lawyers for both sides had attended various social events over the course of several decades, including weddings and parties, with Judge Kay. (The long version is discussed below.) But two events were most relevant: (1) Monk served as a substitute groomsman in Judge Kay's 1987 wedding, and (2) Judge Kay officiated the wedding of Monk's daughter, which the Normans also attended. ROA.28875–76, 28878.

Here is a summary of the relevant conduct:

| **IFG** | **The Port** |
|---|---|
| The Monks would attend the wedding of Judge Kay's daughter. ROA.28879; ROA.33458.<br><br>Notably, the Monks and Normans would apparently walk into the event together. ROA.33457–58. | The Normans would attend the wedding of Judge Kay's daughter. ROA.28884; ROA.33458.<br><br>Notably, the Monks and Normans would apparently walk into the event together. ROA.33457–58. |
| Monk served as a substitute groomsman for Scott McPherson, who married Kay. ROA.28875. Kay and McPherson attended Monk's 1987 birthday party. *Ibid.* | Judge Kay apparently gossiped with Norman about Monk's desire to be a federal judge, noting she did not "think [he] would have been thrilled at the prospect of Mr. Monk being the Article III judge." ROA.33345. |
| Over decades, "[t]exts between Judge Kay and Monk, *which there are admittedly only a few of*, show that Judge Kay wished Monk happy birthday, asked Monk for someone's contact information, and reminisced about a case Monk had tried in front of the judge she clerked for." ROA.28876 (emphasis added). | Judge Kay had interacted with the Port's General Counsel, Michael Dees, at LSU events. ROA.28851; ROA.28886. The two enjoyed a "friendly, professional relationship," ROA.28887, and would exchange emails, including when Judge Kay asked Dees via Facebook for his daughter-in-law's contact information. *Ibid.* |

| IFG | The Port |
|---|---|
| Judge Kay officiated Lucie Monk's wedding. ROA.28878. | Joe Mize, Maura Mize, as well as Norman and his wife received invitations to the wedding. ROA.28889, 33455–56. Norman's wife co-hosted a pre-wedding event and went to the wedding. ROA.33455–56. Polly Norman would state that she "knew from the very beginning" that Judge Kay would officiate the wedding. ROA.34041–42. |
| Judge Kay, her husband, Monk, and Monk's wife would play Trivial Pursuit in a "bigger group of young couples" during the 1980s. ROA.28874–75. | Maura Mize liked photos on Facebook, including one showing Judge Kay as an officiant at Lucie Monk's wedding. ROA.28889. |

The district court then asked whether the Port *actually knew* about the supposed relationship between Judge Kay and Monk. ROA.28890; 28886–88. The district court looked for "direct evidence" that the Port had knowledge of any relationship between Monk and Judge Kay, apparently excluding *any inferences* to that effect. For example, the court discounted that the Port's general counsel, Michael Dees, commented on Judge Kay's photos, including close in time to when she changed her profile photo to an image with Monk. ROA. 20109–10, 29113. What's more, Dees had even liked a post that had photos showing Monk in Judge Kay's wedding. ROA.29104. But the district court said that it would "apply the actual knowledge standard to the new evidence, not the forgiving, inference-laden standard that IFG so adamantly prefers." ROA.29114. The district court would accept neither inferences nor constructive knowledge.

Under this heightened standard, the district court held that the Port did not have actual knowledge of the conflict. True, there *was* evidence the

Port's lawyers saw photos of Monk and Judge Kay, including at the wedding in question. ROA.29104. And true, the Port's lawyers were invited to—and Norman attended—Lucy Monk's wedding. ROA.33455–56. And true, the Port's own emails showed the Port thought it was engaged in a meritless last-ditch attempt to overturn the judgment. ROA.28865 ("I've read some law review articles. I don't see grounds for recusal."). Nonetheless, the district court dismissed all of this as circumstantial evidence of knowledge— not direct evidence. So it vacated the prior judgment.

To sum up, even though there were conflicts on both sides, and even though the natural inference is that all the lawyers knew about any possible conflict, and even though there was plenty of circumstantial evidence to support that inference, IFG lost. IFG timely appealed.

II

As a matter of plain text, this is a simple case. Title 28 provides that a court "may, for good cause shown on its own motion, or under extraordinary circumstances shown by any party, vacate a reference of a civil matter to a magistrate judge under this subsection." 28 U.S.C. § 636(c)(4); *see also* Fed. R. Civ. P. 73(b)(3). Thus, to vacate the judgment, the Port had to prove that this case involves "extraordinary circumstances."

There are two reasons that this case does not involve the requisite extraordinary circumstances. First, this case involves commonplace relationships between bench and bar. Those relationships do not constitute grounds for vacatur. Second, the relevant statute's reference to "extraordinary circumstances" requires parties to exercise diligence and act in a "faultless" way to get vacatur. *See BLOM Bank SAL v. Honickman*, 605 U.S. 204, 212 (2025) (quotation omitted). Such a requirement necessarily excludes the "actual knowledge" standard proffered by the Port and adopted by the district court.

A

Start with the text. *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023). The phrase "extraordinary" means "[b]eyond or out of the common order or method; not usual, customary, regular, or ordinary." Webster's New International Dictionary 903 (2d ed. 1934; 1950) ("Webster's Second").

Nothing about this case is extraordinary or out of the common order. Consider the "worst" fact: IFG's lawyer (Monk) served as a substitute groomsman in Judge Kay's wedding thirty years ago. ROA. 28875. It is difficult to understand how attending a long-ago wedding is an extraordinary event. As the district court in this case originally found, such participation would not require recusal or even disclosure to the parties. ROA.23153. And its potential for creating a conflict of interest is particularly weak here: There is evidence in the record that Judge Kay did not even like Monk and gossiped about Monk's desire to become a federal judge with the Port's lawyer. ROA.28877 n.78; ROA.33345–46.

At the very most, the Port has shown that Monk and Judge Kay occasionally attended the same social events, most of which were decades ago, and had a reasonably warm professional relationship that sometimes included social activities or text messages. As I see it, attending a few group meals and social events, exchanging friendly text messages, and the like over the course of a few decades is ordinary—not extraordinary. That notion is supported by the fact that lawyers for both sides had various personal relationships with Judge Kay. If the Monk-Kay relationship was improper, so was the Norman-Kay relationship. And so was the Dees-Kay relationship. Rather than accept the absurd result that the entire Lake Charles Bar somehow violated their oaths to the court, we should acknowledge reality.

Members of a small legal community all knew each other, recommended each other for jobs, and occasionally crossed paths at social events.

At bottom, ordinary relationships by definition cannot be the "extraordinary circumstances" required to vacate a magistrate order. That simple principle should resolve this case.

B

Perhaps attempting to obscure this commonsense result, the Port says they needed to have "actual knowledge" of any alleged conflict between Judge Kay and Monk to consent to trial. Supposedly, the lack of that actual knowledge is an extraordinary circumstance mandating vacatur. But this standard is not consistent with the statutory text, either.

In legal contexts, the term "extraordinary" designates "[t]he degree of care, caution, diligence, or the like, which is exercised by very or extremely prudent and thoughtful persons, exceeding the care exercised by persons of ordinary prudence . . . ." WEBSTER'S SECOND, *supra*, at 903. It means "extra; additional" action. *Ibid.* The Supreme Court has defined "extraordinary" circumstances in much the same way: It has said that where "the basis for relief in [a] case is extraordinary," it is "[o]f particular importance" that a party did not show "neglect or lack of due diligence." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988).

Take for example the "extraordinary circumstances" standard that has long governed Rule 60(b)(6) motions. *See Ackermann v. United States*, 340 U.S. 193, 199–200 (1950); *BLOM Bank*, 605 U.S. at 212. In discussing that requirement, the Court has "underscored the stringency of the 'extraordinary circumstances' test." *BLOM Bank*, 605 U.S. at 212. It has said that a movant must be "faultless," *ibid.* (quotation omitted), and that a litigant who does not discover facts it should have known is not "completely without fault for his or her predicament." *Ibid.* (quoting 12 J. MOORE ET

al., Moore's Federal Practice § 60.48[3][b], p. 60–188 (3d ed. 2024)).

The upshot is clear: Whether under Rule 60(b)(6) or under § 636(c)(4), the party seeking to vacate a magistrate judge award must be faultless and must have exercised more care than even a reasonable party.

An actual knowledge standard is incompatible with both requirements. Under the actual knowledge standard, a party could simply *do nothing*, sit on significant circumstantial evidence, or ignore attempts to provide direct evidence. They could exercise no diligence or care at all and *still* win. That no-care-at-all approach cannot fit the textual definition of extraordinary circumstances.

The Port cannot meet this extraordinary-circumstance standard here either. Indeed, the Port's conduct was either (1) malicious, as it deliberately cooked up a scheme to discredit a magistrate judge in order to avoid paying treble damages after judgment, ROA.45286 (explaining "the feds don't like that kind of stink," so the lawyer should "mention [Margaret's clerkship with Judge Kay] quite a bit" in the hopes of winning at the Fifth Circuit), or (2) so plainly incompetent that their General Counsel and three trial lawyers (Norman and the Mizes) missed probative evidence that their *wives* found on Facebook. If the former, the Port is the opposite of faultless. If the latter, the Port's directors should pursue a malpractice claim. But neither scenario fits the textual definition of "extraordinary circumstances" that justifies relief. So the Port's "actual knowledge" standard fails as a matter of the statute's plain text.

## III

If this court were to look beyond the statutory text, there are at least three reasons to reject the Port's "actual knowledge" standard. First, precedent. Second, incentives. And third, results.

A

If the plain text and recent Supreme Court precedent are not enough, our own precedent also points to a constructive knowledge standard. That result is unsurprising, since an actual knowledge standard contravenes the sweep of American law.

Under circuit precedent, a party can vacate a magistrate award if its "consent was obtained involuntarily." *Carter v. Sea Land Servs., Inc.*, 816 F.2d 1018, 1021 (5th Cir. 1987). And that determination requires parsing an eight-factor balancing test. *Ibid.* "Among the things a court may consider" are: (1) undue delay; (2) inconvenience to the court and witnesses; (3) prejudice to the parties; (4) whether the movant is acting *pro se*; (5) whether consent was voluntary and uncoerced; (6) whether the motion is made in good faith or is dilatory and contrived; (7) the possibility of bias or prejudice on the part of the magistrate; and (8) whether the interests of justice would best be served by holding a party to its consent. *Ibid. Carter* derived these factors from various areas of law: criminal law, *see United States v. Carr*, 740 F.2d 339 (5th Cir. 1984), habeas corpus, *see Gandy v. Alabama*, 569 F.2d 1318 (5th Cir. 1978), tax law, *see United States v. Lochamy*, 724 F.2d 494 (5th Cir. 1984), secured transactions and credit agreements, *United States v. Unum, Inc.*, 658 F.2d 300 (5th Cir. Unit A Oct. 1981); *Chanofsky v. Chase Manhattan Corp.*, 530 F.2d 470 (2d Cir. 1976), and so on. *See Carter*, 816 F.2d at 1021.

Looking to these same legal areas, an actual knowledge standard makes even less sense. For example, in the criminal law context from which *Carter* draws, constructive knowledge is sufficient. In *United States v. Dobey*, for example, the Tenth Circuit held that the defendants' consent to trial before a magistrate was voluntary even though they claimed not to know about the magistrate's non-Article III status. 751 F.2d 1140, 1142–43 (10th Cir. 1985). Similarly, in the habeas context, a *pro se* petitioner's decision to

proceed before a magistrate judge was knowing because the petitioner should have known he had a right to an Article III adjudicator. *Norris v. Schotten*, 146 F.3d 314, 326 (6th Cir. 1998).

Another apt comparator is the judicial recusal context. In the Fifth Circuit, a party seeking a judge's recusal must move for recusal when he "knows or should know" of the facts on which he bases the request. *Kerns v. First State Bank of Ben Wheeler (In re Kearns)*, 130 F.4th 455, 464 (5th Cir. 2025) (quoting *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir. 1986)). In *Kearns*, this circuit said a lack of diligence can prove fatal to recusal motions—which obviously implies a constructive knowledge standard. *Ibid.*; *see United States v. Whorley*, 550 F.3d 326, 339 (4th Cir. 2008).

The juror disqualification context is much the same. Parties cannot bring a juror disqualification challenge if the offending information could have been discovered before the verdict through reasonable diligence. *United States v. Wilson*, 116 F.3d 1066, 1086–87 (5th Cir. 1997), *vacated in part on other grounds sub nom.*, *United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998) (en banc).

Same with arbitration. Our court has recognized that parties may not object to an arbitrator's supposed conflict of interest if they have "constructive knowledge of the conflict at the time of the arbitration hearing but fails to object." *Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320, 322 (5th Cir. 2019) (per curiam). All told, in the judicial recusal, juror disqualification, and arbitration arenas, constructive knowledge is sufficient.

*Carter* is far from perfect.[1] But if this court is going to apply such tests, they must be applied consistently. And here, a wide range of contexts

[1] The *Carter* test leaves much to be desired. Just like all multi-factor balancing tests, it is "utterly indeterminate." *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 565 U.S. 994,

(identical to those in *Carter*) ground consent in a constructive knowledge standard.

This focus on constructive knowledge makes sense. After all, constructive knowledge is merely a type of knowledge: "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Constructive Knowledge*, Black's Law Dictionary (12th ed. 2024); *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 185 (2020) (similar); *Herbst v. Scott*, 42 F.3d 902, 906 (5th Cir. 1995) (litigant who "should have known" about his claims had "constructive knowledge" of them).

At bottom, this court's precedent looks to disparate areas of law to determine whether a party can vacate a magistrate award for lack of consent. And those areas of law employ a constructive knowledge standard. In my view, such authorities demonstrate that the default posture should be constructive—not actual—knowledge.

B.

One reason that courts employ constructive knowledge is that it offers the only sensible set of incentives.

The constructive notice standard places the burden of litigation on the parties *ex ante*. The parties are supposed to be active participants in litigation, and there should be a penalty for doing nothing. By placing the onus on parties, the parties are discouraged from doing what the Port did here: last-

---

994 (2011) (Thomas, J., dissenting from the denial of certiorari). Even worse, *Carter* makes no attempt to ground its test in the statutory text (other than a brief note that magistrate judges rely on party consent). *Carter*, 816 F.2d at 1021. And even worse, only one of the cases *Carter* cited to derive its test concerns the validity of a party's consent to magistrate judge adjudication. *See Parks ex rel. Parks v. Collins*, 736 F.2d 313, 313 (5th Cir. 1984).

minute, hail-Mary recusal motions that were either disingenuous attempts to overturn judgments or confessions of professional incompetence so embarrassing that they could be remedied only by wives with Facebook accounts. *See Delesdernier v. Porterie*, 666 F.2d 116, 121 (5th Cir. 1982).

In contrast, an actual-knowledge rule would misallocate resources and create obvious, perverse incentives. First, a magistrate or bankruptcy judge would have to disclose any and all social relationships dating back decades. Even humdrum connections could void years of hard-fought, expensive, and honest litigation. Second, losing parties would be incentivized to conduct the sort-of "investigation" of jurists that occurred here. Attendance at a single event, decades ago, could result in overturned judicial proceedings. Old weddings? Old friends? Old board game partners? All grounds for the sore loser to complain—and win. And third, the actual knowledge standard entitles losers to disingenuously say they lacked knowledge of any conflict. And they can do so in the face of strong circumstantial and inferential knowledge without sacrificing anything.

Usually, the story of the ostrich burying its head in the sand is a cautionary tale. But it turns up gold under the actual knowledge standard.

### C

Even worse, such incentives could have serious consequences for magistrate and bankruptcy adjudications nationwide. Both magistrate and bankruptcy judges draw their power to adjudicate disputes in part from party consent. So a decision empowering parties to retroactively revoke that consent based on spurious legal "conflicts" undermines the system. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b); 28 U.S.C. § 157(c)(2).

Recall the facts. The Port's lawyers repeatedly searched for a legitimate, on-the-merits way out of this judgment. And after exhausting all

legally meritorious options, they were able to overturn a $112 million judgment based primarily on wedding photos from the 1980s.

As amici explain, such gamesmanship could be the rule in future cases, not the exception. That's because magistrate judges are "by virtue of their selection process, drawn from the legal communities in which they serve." Br. of *Amicus Curiae* Former Magistrate & Dist. Ct. Judges at 17. They are often "selected after years of public service" and, as here, "likely to have connections to many parties and litigants." *Ibid.* Such backgrounds are "especially prevalent in small legal communities like Lake Charles," but "far from exclusive to those settings." *Ibid.* So too with bankruptcy courts: after all, there is "tremendous local variation in the practice of bankruptcy." *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1536 (9th Cir. 1994) (Poole, J., concurring in part and dissenting in part), *amended*, 46 F.3d 969 (9th Cir. 1995).

At a minimum, the majority's actual knowledge standard means that magistrate and bankruptcy judges might face an evidentiary hearing like the one Judge Kay suffered in this case. And on the merits, it could lead to crass gamesmanship in which parties strategically delay their concerns until they lose and then use those purported concerns to overturn lengthy, expensive, and fully litigated trials.

IV

Finally, three specific responses to the majority.

First, it is black letter law that "most matters relating to judicial disqualification [do] not rise to a constitutional level." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948)). And the Port explicitly conceded that its challenge "is not based on any intentional acts of fraud, bias, or undue influence by the

Magistrate Judge." ROA.22916. If that is true, the Port's constitutional arguments are meritless.

Second, and with deep respect to the majority, even if I were to accept the majority's constitutional framing of this case, I remain unconvinced by the majority's analogy to jury trials. That's because parties can expressly or impliedly waive their rights to a jury. *Pizza Hut L.L.C. v. Pandya*, 79 F.4th 535, 540 (5th Cir. 2023). There is broad agreement amongst the circuits on this score. *See, e.g.*, *Smith Eng'g Co. v. Pray*, 61 F.2d 687, 693 (9th Cir. 1932); *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1159 n.7 (7th Cir. 1994); *Waldman v. Stone*, 698 F.3d 910, 920 (6th Cir. 2012). So it is odd, to say the least, to ground an actual knowledge standard in a context where implication and constructive waiver suffice. Indeed, even the majority's cases support constructive wavier so long as it is "scrutinized with the utmost care." *McDonald v. Steward*, 132 F.3d 225, 229 (5th Cir. 1998) (quotation omitted). It is impossible to derive an "actual knowledge" standard from such permissive language.

Third, how precisely will anyone ever satisfy this brand-new actual knowledge standard? For starters:

- Can courts infer actual knowledge of a conflict?
    - If such inferences are possible, what is the difference between actual knowledge and implied or constructive knowledge?
    - If such inferences are not possible, just how much direct proof is necessary to show actual knowledge? Must the actual knowledge be evidenced by—
        - A declaration?
        - An affidavit?
        - Advice of counsel?
        - Audio?

        - Video?
        - Blood?
- If a General Counsel had actual knowledge of a conflict, is that knowledge imputed to the corporate entity?
- If a chief executive officer had actual knowledge of a conflict, is that knowledge imputed to the corporate entity?
    - Would it matter if the chief executive was on the board of directors?
- If an interested party sent letters alerting each board member to the conflict, does that act give rise to actual knowledge?
    - Could the board simply say they did not receive letters? Would it matter if the letters were sent return receipt requested?
    - What if one sent letters to only a minority of board members?
- What if the shareholders knew about the conflict but the board denied knowledge?

I could go on. But at bottom, there is no better hypothetical than what occurred in this case. Assume, for a moment, that IFG lost at trial. Could it argue that Judge Kay's order should be vacated because of *the Port*'s actions? After all, in the Port's framing, Judge Kay also "failed to disclose" she was (1) formerly an attorney at Norman's firm; (2) was selected by a committee Norman served on; (3) was apparently friends with Dees; and (4) gossiped with Norman about Monk's chances at becoming a federal judge? Under the majority's standard, the answer is yes.

And therein lies the rub. It is hard to imagine how any magistrate or bankruptcy judge adjudication could survive the standard set out in today's opinion.

* * *

The Port set a trap: muddy the waters with facts and hope the resulting mess justifies some rule that vacates the judgment.

It is a mistake to follow that course. Rather than craft a new standard that risks jeopardizing magistrate and bankruptcy judge adjudication, we should apply the constructive knowledge standard that the statutory text, our precedent, and commonsense demand. With deepest regard for my esteemed colleagues who see the case differently, I respectfully dissent.